**Konstantinos CATRAKIS**

**v.**

**NAUTILUS PETROLEUM CARRIERS CORP.**

**v.**

**William GREEN, Third-Party Defendant.**

**No. 73 Civ. 806.**

United States District Court,
S. D. New York.

Feb. 18, 1977.

[redacted]

[redacted]

[redacted]

Arum, Friedman & Katz, New York City, for plaintiff.

Healey, Stonebridge & McCaffrey, New York City, for defendant and third-party defendant.

VINCENT L. BRODERICK, District Judge.

Plaintiff Konstantinos Catrakis was third mate on the ship "S.S. Sister Katingo", owned by the defendant. William Green, the third party defendant, was the chief pumpman on that ship. Plaintiff is a naturalized American citizen, although he resides in Greece. Since 1958 he has been active in the American Merchant Marine, initially as a seaman, and since 1968 as an officer.

Plaintiff brought an action herein against the defendant under the Jones Act, alleging unseaworthiness and negligence, and failure to pay wages and maintenance and cure in connection with an injury incurred by plaintiff on November 17, 1971. A trial was had before Judge Motley in June, 1976, in which the jury found for the defendant on the issue of seaworthiness and disagreed with respect to negligence. A retrial of the

negligence issue was had before me in December 1976, and the jury found for the defendant.

The parties stipulated that the issue of defendant's liability to the plaintiff, if any, for maintenance and cure and for unpaid wages would be determined by the Court.

Plaintiff's injuries which were the subject of the claims herein were incurred in an assault on him by Green, the third party defendant. The facts concerning the relations between plaintiff and Green during the period immediately preceding the assault, and concerning defendant's knowledge of those relations, are useful in determination of the ultimate issues to be decided.

On one occasion in the fall of 1971, when the S.S. Sister Katingo was in a European port for the purpose of unloading oil, plaintiff Catrakis, who was the deck officer on duty, was asked by the captain to make sure that the oil was discharged from various tanks in such wise that the ship would remain on an even keel. Green as the chief pumpman was responsible for the mechanics of the unloading. As oil was unloaded from the ship, Catrakis noticed that the bow was higher than the stern. He drew this to Green's attention and told him to shift the unloading process to other tanks so as to reestablish an even keel. Green told the plaintiff not to bother him. Catrakis thereupon made the unloading adjustments which were necessary to reestablish an even keel, and that evening informed the captain of Green's refusal to obey orders. The captain instructed Green to obey the mate thereafter, and told Catrakis that the next time that Green disobeyed an order he should make an entry in the log book.

A short time thereafter a crewman warned Catrakis not to pass through a certain part of the ship because Green was waiting there to assault him. Catrakis reported this to the captain: the captain told Catrakis not to make a log book entry, but assured him that if Green tried to assault him he, the captain, would "fix" him.

On November 5, 1971, plaintiff saw Green in a spare room on the ship where belongings of absent crew members were kept. This room was normally locked. Green had opened a gear locker and had his hands inside a handbag which belonged to a missing crew member. He was inspecting the various items in this bag. When Green saw Catrakis, he closed the handbag and the locker. Catrakis reported this incident to the captain, who stated that nobody had given Green authority to enter the spare room, and directed Catrakis to make a log entry about the matter.[1] Catrakis explained to the captain that he took no action against Green at the scene because Green had indirectly threatened him with bodily harm and injury.

Four days later, on November 9, the captain called Green, Catrakis, the chief engineer and the chief mate to his quarters for an "investigation" into the incident of November 5. Green's explanation of his presence in the spare room was that he went there to repair the toilet: he found the door unlocked and attended to the necessary repairs. It could not be determined who sent Green to repair the toilet or who complained it needed repair. The clothes locker which contained the missing seaman's personal effects had always been kept locked,

---

1. Plaintiff's log entry with respect to the incident reads as follows:

    Offense committed: Mr. K. Catrakis, 3rd Mate, Z1123764, Deck Officer on duty this date, states that—at 1415 hours 3rd Mate K. Catrakis, while on duty observed Mr. William Green, Chief Pumpman, in gear locker in spare room starboard side aft of Chief Mate's room. This locker contains personal effects of crew members that have failed to join vessel at sailing time. The above incident occured [sic] while the Captain and other Officers were ashore therefore the Chief Pumpman had no business in the officer's quarters and without the knowledge of the officer of the deck on duty, being notified. I saw Mr. Green with his hand in a hand bag which did not belong to him but personal effects of some crew member that has failed to join. I personally did nothing at the time or [sic] try and stop him or question him due to his having threatened me 'indirectly' at [sic] bodily harm and injury. Signed —Konstantinos Catrakis 3/mate.—

and contained no toilet: Green said that he opened this locker to check the contents, using a pass key which the chief mate gave him.

The captain ordered Green to stay away thereafter from that area of the ship unless specifically ordered to enter it, and under those circumstances to report to the officer on watch. He directed him to refrain from opening lockers. He ordered him to surrender any pass keys in his possession. The matter was then referred for any further action to the Coast Guard. Green refused to make response to plaintiff's charges, saying that he would reply to the Coast Guard.[2]

On November 17, 1971, when the "S.S. Sister Katingo" was in a port near Naples, plaintiff Catrakis went to the Seamen's Club in Naples to make a telephone call to his father, who was hospitalized in Greece. As he was leaving the Seamen's Club, he was assaulted by Green, who hit him on the right side of his jaw. He was rendered unconscious. The Naples police took him to the hospital, and then to the police station. Thereafter he was taken to the International Hospital in Naples, where he was examined and kept overnight. He was found fit for duty the next day and went back to his ship.

The ship proceeded to Crete, where plaintiff was examined by a doctor and found not fit for duty. He was repatriated to the United States where he was hospitalized in the U. S. Public Health Service Hospital on Staten Island. He was an inmate in that hospital from November 25 until December 2, 1971,[3] and was an outpatient from that time until November 5, 1972, when he was declared fit for duty. Plaintiff commenced working once again in November of 1972, initially as a night mate on ships in port. He shipped out to sea again in May, 1973.

The voyage of the S.S. Sister Katingo in the course of which plaintiff's injury was incurred commenced on September 30, 1971, and terminated September 27, 1972. Plaintiff was discharged from the ship as not fit for duty on November 22, 1971. The defendant continued to pay plaintiff wages for a period thereafter, and then stopped paying such wages. Defendant also paid plaintiff maintenance for some time after his discharge from the U. S. Public Health Service Hospital, and then cut off such pay-

2. The S.S. Sister Katingo's log book entry with respect to this investigative meeting reads as follows:

At 1020 hours 11–9–71 Master Called Mr. Green, Mr. Catrakis, also Mr. F. Bolton, Chief Engineer and Mr. R. Haller, Ch Mate to his quarters for investigation of the matter. It followed it could not be exactly determined, who sent Mr. Green to repair the toilet in the spare room or who first complained it needed repair. On further questioning, Green stated, he found the spare room door unlocked and entered, and attended to repairs. Mr. Catrakis here stated he could not hear any noise of tools or of activity of any kind after opening spare room door and looking in. This door is mostly locked, but may have been unlocked in port for MSC cargo inspector's use; Mr. Jack Mason. The clothes locker containing missing seamen's personal effects is religiously kept locked, Master having personally checked same on dozens of occasions and never having found it open. It does not contain a toilet. Green admitted opening this locker to check the contents inside, an action clearly inconsistent with any duties he may have had. He stated he had in his possession only pass keys issued him by Mr. Bolton.

As a result of investigation, Master orders Green to —1. henceforth stay out of midship quarters unless specifically ordered to enter by his department head and even then always report to the officer on watch. Further ordered —2. At No time to open and strictly refrain from opening lockers or other compartments personal to Officer's or ex Seamen's personal effects. Further ordered —3. To surrender all pass keys and/or other devices capable of opening any ship's compartments except his own quarters keys, and is asked a direct question—"will you comply now"?

Charges preferred by—S. J. Ergon, Master Witness to offense—Konstantinos Catrakis Seaman's reply I will make my reply to the Coast Guard. To question 3 'Yes'

Action taken: Referral to U.S.C.G. for any action pending."

3. Plaintiff was found "not fit for duty" when he was discharged from the hospital on December 2, 1971. He was examined as an outpatient on January 6, February 17, March 30, May 11, June 5, and August 23, 1972, and on each occasion found "not fit for duty" by reason of his head injury.

ments. Plaintiff and defendant have stipulated that the total of unpaid maintenance at $8 per day for 201 days is $1,608, and that the total of unpaid wages is $8,485.25.[4]

■ Both plaintiff and Green testified at the December trial. Plaintiff testified that he was struck by Green, while he was leaving the Seamen's Club in Naples, and that Green had in his hand, as he struck him, an instrument resembling a pipe. Green's testimony, which I find not credible, was to the effect that plaintiff first made a threatening gesture towards him, and that Green's blow was a responsive one. Green denied that he had anything in his hand. I find the facts as testified to by plaintiff, and that plaintiff was without fault in the incident.

Defendant gave no explanation, during the course of this trial, why it discontinued paying to plaintiff his wages and maintenance. Prior to the assault, as detailed above, plaintiff had drawn to defendant's attention, through the captain of the S.S. Sister Katingo, that defendant's chief pumpman, Green, had indirectly threatened him. Defendant knew through its captain, and its records reflect, that plaintiff had reported discovering Green commit a serious dereliction. Thus defendant through its agents knew of the incidents which preceded the assault upon plaintiff, as well as the circumstances surrounding the assault itself. There is not a scintilla of evidence in the record, save the testimony of Green which I have found not credible, to indicate other than that plaintiff was the victim of an unprovoked assault. Nor was there any such evidence available to defendant. It is clear that the motivation for the unprovoked assault was the fact that plaintiff's proper performance of his duties as an officer of the S.S. Sister Katingo had impinged, and presumably would continue to impinge, upon chief pumpman Green's license to do as he pleased.

■ Plaintiff's entitlement to maintenance until found fit for duty, and to unpaid wages to the end of the voyage, is clear. A seaman who is rendered unfit for duty by injury in the course of a voyage is entitled to receive maintenance and cure from the time of the injury until he is declared fit for duty, or until a finding is made that his injury is permanent and no further cure is possible. *Vaughan v. Atkinson*, 369 U.S. 527, 531–2, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Vella v. Ford Motor Company*, 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1974). He is entitled to be paid wages until the end of the voyage on which the injury was incurred. *Isthmian Lines v. Haire*, 334 F.2d 521 (5th Cir. 1964); *Jones v. Waterman S.S. Corporation*, 155 F.2d 992, 995 (3d Cir. 1946). From the time of plaintiff's original hospitalization at the United States Public Health Service in Staten Island on November 25, 1971, through September 27, 1972, plaintiff was consistently found to be not fit for duty. The fact that maximum cure was not achieved during this period is conclusively established by the fact that the U. S. Public Health Service, which found plaintiff "not fit for duty" on at least seven occasions from December 2, 1971 to August 23, 1972 (*see* note 3, *supra*), finally did find him "fit for duty" on November 5, 1972.

■ The happenstance that the assault upon plaintiff took place ashore in Naples rather than on the S.S. Sister Katingo is legally irrelevant. Even without reference to the fact that in this instance the assault was prompted by plaintiff's proper performance of his duties as third mate of defendant's ship, a seaman on shore leave in a foreign port is in the service of his ship (*see Aguilar v. Standard Oil of New Jersey*, 318 U.S. 724, 733–4, 63 S.Ct. 930, 87 L.Ed. 1107 [1943]). If an accident occurs during that shore leave which renders the seaman unfit for duty, the seaman's employer remains responsible to pay him wages until

4. Any expenses in connection with plaintiff's hospitalization in Naples, in Crete, or in the U. S. Public Health Service Hospital in Staten Island were borne either by defendant or by the United States Government. The only item of

"cure" paid for by plaintiff with respect to which testimony was adduced during the course of the trial was $180 which plaintiff paid for the capping of one of his teeth which was broken when he was assaulted.

the end of the voyage, and to provide for his maintenance and cure until there is a finding that he has reached maximum cure and is permanently disabled, or a finding that he is fit for duty.[5]

Once it was determined, in Crete, that plaintiff was unfit for duty, the defendant, again through its agents, took the appropriate steps to send him to the U. S. Public Health Service Hospital in Staten Island. For a time it continued to pay him his wages and, after his discharge from the hospital, his maintenance.

Then defendant discontinued paying plaintiff maintenance and wages, with no explanation to him, so far as the record reveals, of the reason for the discontinuance. Nor does the record indicate that any facts had come to the attention of defendant which even colorably changed the nature of its obligations to plaintiff. It became necessary for plaintiff to retain an attorney and seek in the federal courts that which was plainly owed to him. "The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one." (*Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962).

■ Thus I find that defendant was callous and reckless in failing to recognize its continuing obligations to plaintiff, and that its action in cutting off payment of wages and maintenance to plaintiff stemmed from a "wanton and intentional" disregard of his rights as a seaman (*see Vaughan v. Atkinson*, 369 U.S. 527, 540, 82 S.Ct. 997, 8 L.Ed.2d 88 [1962] [dissenting opinion of Mr. Justice Stewart]).

■ I therefore find that defendant owes plaintiff $8,485.25 in unpaid wages,

and $1,608 in maintenance, in addition to interest. The interest is to be computed on the unpaid wages and maintenance on a weekly basis as they became due.[6] Since this maintenance and these wages should have been paid to plaintiff, and defendant was reckless in its disregard of its obligation to pay them, I find that plaintiff is entitled to reasonable counsel fees. Defendant shall, therefore, pay counsel fees to plaintiff in the amount of 40% of the sum of the unpaid wages, maintenance and interest.

The foregoing constitute findings of facts and conclusions of law. Submit judgment on notice in accordance herewith and in accordance with jury verdict on issue of negligence.

SO ORDERED.

---

5. Even negligence on the part of a seaman in incurring injury does not relieve his employers of their obligations to pay him wages and to provide maintenance and cure (*Gulledge v. U. S.*, 337 F.Supp. 1108 [E.D.Pa.1972]). Only where the seaman through his own wilful misconduct has invited accident or injury is his employer relieved (*Watson v. Joshua Hendy Corporation*, 245 F.2d 463 [2d Cir. 1957]; *see*

*Murphy v. Light*, 224 F.2d 944 [5th Cir. 1955]). There was no such misconduct by the plaintiff herein.

6. Interest to August 31, 1972 is to be computed at the rate of 7½% per annum. Interest from September 1, 1972 to the present is to be computed at the rate of 6% per annum. The interest is not to be compounded.