Stewart V. DIXON, Plaintiff,

v.

MARITIME OVERSEAS CORP.,
Defendant.

No. 78 Civ. 5929.

United States District Court,
S. D. New York.

April 23, 1980.

Klein, Cohen & Schwartzenberg, New York City, for plaintiff; Max Cohen, New York City, of counsel.

Walker & Corsa, New York City, for defendant; Joseph T. Stearns, New York City, of counsel.

IRVING BEN COOPER, District Judge.

Plaintiff brought suit against defendant for injuries to his knee sustained on August 3, 1978 aboard defendant's ship while employed as an able-bodied seaman. On January 18, 1980 the jury rendered a verdict in favor of the plaintiff: $108,000 in damages for injuries to plaintiff on his claim of unseaworthiness; $29,776 for maintenance and cure. Defendant Maritime Overseas Corporation now moves for relief in two respects: (1) a new trial, pursuant to Fed.R. Civ.P. 59, on the unseaworthiness cause of action and (2) for judgment notwithstanding the verdict, pursuant to Rule 50 of the Fed.R.Civ.P., or for a new trial or remittitur with respect to maintenance and cure.

*Maintenance and Cure*

■ In light of the two different causes of action dealt with here, it might be well to keep in mind the true purpose of maintenance and cure. "Maintenance and cure is a contractual form of compensation given by general maritime law to a seaman who falls ill while in the service of his vessel." *Evans v. Blidberg Rothchild Co.*, 382 F.2d 637, 639 (4th Cir. 1967). It must be remembered that maintenance and cure is not a panacea; its objectives are limited. *Farrell v. U. S.*, 336 U.S. 511, 519, 69 S.Ct. 707, 711, 93 L.Ed. 850 (1949) puts it plainly:

> Maintenance and cure is not the only recourse of the injured seaman. In an appropriate case he may obtain indemnity or compensation for injury due to negligence or unseaworthiness and may recover, by trial before court and jury, damages for partial or total disability. But maintenance and cure is more certain if more limited in its benefits. *It does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life.* (emphasis added)

The obligation to provide maintenance and cure ends at "the point where the maximum possible cure has been attained." M. Norris, The Law of Seamen § 562 (3d ed. 1970) [hereinafter cited as Norris]; G. Gilmore & C. Black, The Law of Admiralty § 6–10 (2d ed. 1975); *Oliveras v. United States Lines Co.*, 318 F.2d 890, 893 (2d Cir. 1963); *Brahms v. Moore-McCormack Lines*, 133 F.Supp. 283, 285 (S.D.N.Y.1955); *See also Berke v. Lehigh Marine Disposal Corp.*, 435 F.2d 1073, 1076 n.3 (2d Cir. 1970); *Vandinter v. American Steamship Co.*, 387 F.Supp. 989, 990 (W.D.N.Y.1975); Norris § 563.

■ Although awards for accrued maintenance and cure have been approved for periods as long as seven years (see *Koslusky v. United States*, 208 F.2d 957 (2d Cir. 1953)), a grant of prospective maintenance is only allowed for short periods of time which are definitely capable of ascertainment. The grant of a lump sum for an indefinite period is invalid. *Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); *Campbell v. American Foreign S. S. Corp.*, 116 F.2d 926, 929 (2d Cir. 1941); *Keiser v. American President Lines, Ltd.*, 384 F.Supp. 554, 555 (S.D.N.Y. 1974); Norris § 567.

Plaintiff was injured on August 3, 1978; he was declared fit for duty and recommenced work on October 9, 1978. No claim was made for maintenance and cure for this period because plaintiff had been paid. Plaintiff only claimed maintenance and cure from the time he was reinjured in his subsequent employment aboard the S. S. Virgo, on January 20, 1979, until April 2, 1979, when he was declared fit for duty.

The jury was charged that maintenance and cure runs only until the time when a "maximum cure" is reached, and this term was defined. It was explained that "This does not mean a complete cure has been effected. It means only that the plaintiff can recuperate no further from his injuries . . . ." Charge of Court, Transcript of Jan. 14, 1980, p. 25 [hereinafter cited as Charge]. The jury was also charged that it "may find that it [maximum cure] has not yet been reached." (Charge at 26.) The jury was then instructed that in calculating the amount of the maintenance and cure:

Despite inflation or other factors, the union contract establishes the rate for payment of maintenance and cure at $8.00 a day. That is binding on the plaintiff. Thus, you may multiply this figure by the number of days that the plaintiff was due his maintenance and cure under the guidelines I have already given you.

*Id.*

Defendant contends that the maximum maintenance and cure that can be awarded is $8.00 a day for a period of 72 days (January 20, 1979-April 2, 1979), or $576.00. Plaintiff agrees that he can only recover maintenance and cure for a period of "some 72 days." However, he argues that this number of days should be multiplied by $25.00. Therefore, plaintiff argues that "we are of the opinion that any *remittitur* should reduce the verdict on the maintenance award to no less than $1800," but he adds that this would be "together with appropriate interest, and reserving all rights as to damages because of defendant's willful failure to pay maintenance and cure." Answering Affidavit of Max Cohen, Esq., filed Feb. 8, 1980, at ¶ 4.

The jury was charged to grant $8 per day until the point of maximum cure, which we believe was correctly defined.

■ We denied plaintiff's routine demand for counsel fees for the simple reason that the total trial record was completely barren of any evidence reflecting that the shipowner had been "callous in [its] attitude," "recalcitran[t]," or "willful and persistent" in failing to pay maintenance and cure, proof required for the granting of such relief. *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Roberts v. S.S. Argentina*, 359 F.2d 430 (2d Cir. 1966).

■ The granting of costs and interest also requires that circumstances had existed in which the defendant had been "callous and reckless in failing to recognize its continuing obligations to plaintiff, and that its action in cutting off payment of . . . maintenance to plaintiff stemmed from a 'wanton and intentional' disregard of his rights as a seaman." *Catrakis v. Nautilus Petroleum Carriers Corp.*, 427 F.Supp. 255, 260 (S.D.N.Y.1977); *Vandinter v. American Steamship Cc.*, 387 F.Supp. 989, 990–91 (W.D.N.Y.1975).

■ We hold that the jury award of $29,776 for maintenance and cure was grossly excessive. As a matter of law, we are compelled to reduce it to $576 ($8. for each of the 72 days claimed). The jury's verdict on this claim demonstrates, to this Court, the jury's conviction that plaintiff's claim

as to the extent of his injuries, their permanency, his pain and suffering, etc. had merit; this conviction accounts for and is reflected in the verdict on the unseaworthiness claim.

Under Fed.R.Civ.P. 50, the standard for granting a motion for judgment notwithstanding the verdict is the same as that for directing a verdict at the close of evidence. 9 Wright & Miller, Federal Practice and Procedure: Civil §§ 2534, 2537. Formulation of the standard by our Second Circuit is found in *Simblest v. Maynard*, 427 F.2d 1 (2d Cir. 1970): "Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Id.* at 4.

Whereas the verdict is excessive, it does not warrant being set aside, rather, the verdict must be reduced.

### Maintenance and cure: remittitur is the remedy

■ The trial court is empowered to grant a new trial on all issues or on a particular issue to prevent a "miscarriage of justice" resulting from a jury verdict. Since the court has sole discretion over the granting of such a motion, it is a remedy which is not lightly employed. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2803. A jury verdict is not to be disregarded unless a prejudicial error occurs causing "substantial harm" to the losing party. *Id*; Fed.R.Civ.P. 61. The drastic remedy of a new trial is not necessary in an instance such as this where the excess of the award can be segregated from the valid portion.

■ When clearly excessive damages are awarded, the Court will use the procedural device of remittitur to reduce the damages awarded. The denial of the defendant's motion for a new trial is conditioned upon remission of the excess amount by the plaintiff. *Comiskey v. Pennsylvania R.R. Co.*, 228 F.2d 687, 688 (2d Cir. 1956). Wright & Miller describe the procedure this way: "There is . . . a practice, now sanctioned by long usage, by which the court may condition a denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount." 11 Wright & Miller, Federal Practice & Procedure: Civil § 2815. A case, such as this, in which certain identifiable sums included in the verdict should not have been awarded to plaintiff clearly warrants the remedy of remittitur. The filing of a remittitur by the plaintiff should be in the amount of the excess verdict. 11 Wright & Miller: Civil § 2815. Clearly to be avoided is the delay and expense of a new trial.

Plaintiff would have us adopt the position that the per day allowance in this Circuit should be $25.00 rather than the standard $8.00. We rejected this position at trial. The growing burden of inflation, the high cost of living and the diminished value of money are factors about which we are not unsympathetic, however, our Circuit Court has fixed the daily rate for maintenance and cure at $8.00 and we feel so bound.

Since we find it abundantly clear that the maximum period of maintenance and cure herein is 72 days at the prevailing rate of $8.00 a day, plaintiff is directed to file a remittitur in the sum of $29,200; failure to do so will result in a retrial of that claim.

### Verdict on unseaworthiness sound and not excessive

■ The totality of the trial record clearly supports the jury's verdict on the claim of unseaworthiness. The proceedings were not "tainted by prejudice," and the size of the verdict was fair, reasonable and by no means so excessive that it would be "unconscionable to let it stand." 11 Wright & Miller: Civil §§ 2803, 2807.

In terms of weighing the evidence presented at trial, the mere fact of conflicting evidence is not enough to trigger a new trial. Indeed, conflicting evidence is the basis of the adversary system of litigation, and it is the province of the jury alone to "pick and choose" among the items presented for its consideration. "[A] decent re-

spect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Id.* at § 2806. We again emphasize that we entertain no doubt as to the wisdom of the jury's verdict.

The defendant brands plaintiff's version of how the accident happened as a "physical impossibility." We find this without merit. The jury had evidence before it including the plaintiff's own extensive testimony about the extent of his injuries and the circumstances which produced it, also the corroborating evidence of an eyewitness, an able-bodied seaman, who testified that plaintiff's injury occurred in the manner plaintiff stated. There was also the testimony of plaintiff's expert medical witness, Dr. Seaman, that the accident, as described, was the "competent producing cause" of the knee injury which he diagnosed.

We are faced then with a situation of conflicting allegations. It is clear that the jury chose to believe plaintiff's version of the incident. The jury was entrusted with the sworn duty to make judgments, predicated on facts the jury saw fit to adopt in accordance with the measure of proof prescribed by law. We must bear in mind that: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel other results are more reasonable." *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 110, 80 S.Ct. 173, 176, 4 L.Ed.2d 142 (1959) (quoting *Tennant v. Peoria & Perkins Union R. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520).

Our estimate of the trial record here—qualitatively and quantitatively—leads us to the conclusion that the jury's award was not excessive. The reasons given by this District Court for upholding the jury verdict in *Grunenthal v. Long Island Rail Road Co.*, 292 F.Supp. 813 (S.D.N.Y.1967), as explained and affirmed by the Supreme Court, are equally applicable here.

The trial judge . . . considered that in deciding the railroad's motion [for a new trial] he 'must indulge . . . in a fairly accurate estimate of factors to which the jury gave attention, and favorable response, in order to arrive at the verdict announced.' He concluded that the motion should be denied because, applying that standard, the relevant evidence weighed heavily in favor of the jury's assessment. . . . The judge conceded that the aggregate award seemed generous, but he concluded nevertheless that it was 'not generous to a fault or outside the bounds of legal appropriateness.' . . . [T]he trial judge did not abuse his discretion in finding 'nothing untoward, inordinate, unreasonable or outrageous—nothing indicative of a runaway jury or one that lost its head.'

393 U.S. 156, 158–60, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968). (See also 388 F.2d 480 (2d Cir. 1968).)

The language in our opinion on the motion for a new trial in *Milos v. Sea-Land Service, Inc.*, 478 F.Supp. 1019 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 574 (2d Cir. 1980), (Mr. Stearns was defense counsel in *Milos* also) is equally applicable here. "We are overwhelmingly convinced that the record here is replete, practically saturated, with factual questions, the resolution of which support the findings of the jury (which is not to say no other result was conceivable)." *Id.* at 1028.

### The attack on the trial judge by the lawyer for defendant

We read with incredulity and distaste certain portions of the instant moving papers (affidavit of Joseph T. Stearns, verified Jan. 28, 1980) and memorandum in support thereof submitted on behalf of the defendant. We experienced the same reaction upon reading Mr. Stearns' brief submitted in behalf of defendants-appellants (filed March 19, 1980) in the United States Court of Appeals for the Second Circuit, in the case of *Milos v. Sea-Land Service, Inc.*, 622 F.2d 574 (2d Cir. 1980), *aff'g*, 478

F.Supp. 1019 (S.D.N.Y.1979). The trial in that case came on before us on June 5, 1979; Mr. Stearns was the trial lawyer; the jury returned a verdict of $360,000 in favor of plaintiff Milos for personal injuries he sustained while working aboard defendants' vessel. The abuse heaped upon us by Mr. Stearns is of the same caliber in both cases.

We find it relatively easy to dispose of the multitude of objections, raised in another part of the moving papers now before us, that are addressed to claimed errors of law committed by us during the trial and charge to the jury. Many of them closely match the alleged grievances committed by us during trial and charge in the *Milos* case, and raised on appeal by Mr. Stearns. We are compelled to note that much that is there designated harmful, we regard as the pinnacle of nitpicking. We believe our rulings were correct at the time they were made and, after careful examination of the arguments presently advanced, adhere to them.

What we find irresponsible is the assertion now again repeated by Mr. Stearns of what he called our "misconduct." He again impugns to us an improper motive in putting questions to witnesses and making statements during trial—i. e., that our objective was to elicit answers and make statements favorable to the plaintiff. We find it extremely difficult to contain the urge to tell Mr. Stearns "off." We feel compelled, at the very least, to denounce this as not rising to the dignity of contempt. We shall do our utmost to cling exclusively to the facts and law here involved.

We sought only and exclusively to clarify the record, primarily for the benefit of the jury, especially during the testimony of medical experts—often "heavy" and technical. It is true that on occasion our questions evoked answers that Mr. Stearns did not appreciate, but it is the jury, not alone the lawyers, that must clearly understand the total evidence in order to fulfill a sworn obligation to make a legal determination of the factual issues involved.

The law encourages questions put by the trial judge to clarify the trial record. A district judge need not play a passive role in the conduct of a jury trial. The Second Circuit has stated that "[a] judge who conducts a jury trial has a duty to see that the facts are clearly presented and may ask pertinent questions of the witnesses to that end. He is not a mere passive spectator or moderator . . . ." *Pariser v. City of New York*, 146 F.2d 431, 433 (2d Cir. 1945). The judge may interpose relevant questions to witnesses "to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds." *Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir. 1979). A judge "is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano*, 149 F.2d 923, 925 (2d Cir. 1945) (Learned Hand, J.). "Federal judges are not referees at prizefights but functionaries of justice." *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948).

The trial judge must, however, studiously avoid at all costs "tak[ing] on the role of a partisan." *Marzano, supra*, at 926. We determinedly avoided the breach of that prohibition, despite repeated insistence to the contrary and denouncement by Mr. Stearns. "A judge is not wholly at the mercy of counsel . . . ." *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17, 21 (2d Cir. 1962).

He [the judge] sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself. *He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other. . . . The judge is the only disinterested lawyer connected with the proceeding. He has no interest except to see that justice is done, and he has no more important duty than to see that the facts are properly developed and*

*that their bearing upon the question at issue are clearly understood by the jury.* (emphasis added)

*Simon v. United States,* 123 F.2d 80, 83 (4th Cir.), *cert. denied,* 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941).

We explained the essence of the following to the jury in the early part of our charge (see Charge at 10):

> [U]nlike judges in many of our state courts, *a federal judge may comment outright on any portion of the evidence, telling the jury how it struck him, whom he believed, or disbelieved, and the like, provided only that he advises the jury that they are in no way bound by his expressions of such views.* (emphasis added)

*United States v. Rosenberg,* 195 F.2d 583, 594 (2d Cir. 1952).

Encouragement to ask questions of witnesses during trial also has come to us quite frequently over these many years from juries who, after the rendition of verdict in civil or criminal cases, ask "to call on the judge." Almost invariably they express their warm approval and state that "you made it so simple for us to understand. Why did that lawyer and some witnesses talk in such highfalutin terms?" In effect, their comments are the same in respect to the court's charge. After entering upon their deliberations, we hardly ever get a note from the jury asking for clarification. Our objective is that *each* juror, not the "smart" ones alone, understand the law's instructions, to the end that *each* juror will be in a position to actively participate in the rendition of a just verdict—not just blindly follow a "leader." This process of simplification takes much time and lots of energy. We go on doing it fully aware that some lawyers find it "verbose," etc., etc.

We regard it totally baseless for the lawyer to allege in his affidavit and memorandum, among seemingly endless objections, that: (1) The Court conducted the trial in a manner which displayed an adoption of the plaintiff's claim, acting as an advocate in his behalf. This was accomplished by (i) prevention of Mr. Stearns from pursuing his line of questioning of Dr. Seaman by cutting the lawyer off; (ii) explaining away inconsistencies; (iii) showing a high regard for Dr. Seaman's testimony. (2) The Court was openly hostile toward Mr. Stearns, which may have led the jury to believe that the Court was hostile to the defendant's position. (3) The Court's behavior at trial was tantamount to judicial misconduct—the same charge lodged in the *Milos* case.

Mr. Stearns' repetitive charges of judicial intervention, partisanship, erroneous charges, etc., in this matter, and in the *Milos* case, reflect the arid wasteland of his arguments. He seems to feel that the application of a little ink and rhetoric will bring forth flower in the desert. No healthy growth can come from these infertile seeds, nor shall we assist in the inception of infirm ideas. When you don't have either the facts or the law on your side, you make an ad hominem attack.

So it was said by Mr. Stearns, for example, in the *Milos* case: "The District Court's verbose, erroneous, and contradictory charge, and interrogation of jurors and witnesses constituted misconduct. . . ." Brief of Defendants-Appellants at 42. "The district court's approach to the all-important issue of the medical aspects of plaintiff's thumb condition was similarly one-sided in favor of plaintiff." *Id.* at 46. "[T]he district court, apparently in anticipation of this problem in plaintiff's case, offered its own exonerating hypothesis that completely explained and excused plaintiff's sudden memory lapse." *Id.*[1]

The extensive list of what he regards as outrageous in the instant case, essentially the same as was emphasized by him in *Milos* (though even considerably more egregious

---

1. There were quite a few other such comments in the same appellate brief, including, that there was "intimidating interrogation of the prospective jurors." Brief of Defendants-Appellants at 45. "[I]n this district court's view, humility is synonomous [sic] with docility." *Id.* at 44. "[I]t was forcefully impressed upon them [the jury] that such docility (or 'humility') was required if they were to properly discharge their duty." *Id.* at 47. "[T]he court diverted attention." *Id.*

in that case), was filed by Mr. Stearns before our Circuit Court of Appeals decided the *Milos* appeal. It should be borne in mind that the moving papers before us now were filed on January 28, 1980; his brief on appeal in *Milos* was filed March 19, 1980. Mr. Stearns felt safe in using the same line of attack. However, on March 20, 1980 the United States Court of Appeals for the Second Circuit affirmed our judgment in *Milos* holding:

> We find no reason to overturn the jury verdict for the plaintiff. The district court did not err in its charge to the jury concerning the proper standard for awarding damages. The charge sufficiently instructed the jury that damages should be awarded to plaintiff only to the extent that his fall resulted in additional harm to his arthritic thumb. The court's charge on defendants' liability for damages caused by their "slightest" negligence was also proper.
>
> Defendants' contentions that judicial misconduct and errors in the admission of medical testimony constituted reversible error are also without merit.

Mr. Stearns expresses outrage because we called him, in the jury's presence, "insolen[t]." He was, indeed. He neglects to reveal what he said to the Court to engender our uncomplimentary remark:[2] Upon the Court's asking a question during cross-examination of the plaintiff's medical expert,[3] the following ensued: MR. STEARNS: "I say it's improper. THE COURT: Do you? That is your notion. Strike the insolence of counsel. Next question." Transcript of Jan. 8, 1980 at 84. What this trial lawyer also fails to reveal is that his comment was uttered belligerently, his facial expression recorded contempt, his movements depicted disdain for the trial

judge—an attitude he displayed on a few occasions before and during the trial.

█ Trial attorneys have a perfect right to interpose objections to a trial judge's questions, to advance reasons therefor and to make proper comment with respect thereto. All this is easily and fully accomplished by the use of proper language in a respectful manner (even when the attorney firmly believes the judge has erred grievously). This is especially imperative when the jury is present. The attorney must never forget that at all times he has a dual role; he is an officer of the Court as well as an attorney for his client. The disrespectful approach is bound to bring on judicial retort if the jury is not to be "lost"—i. e., if its members are (or even one is) made to look upon the judge as "weak," they are very likely to pay little attention (even without disclosure) to the law charged by an infirm judicial officer, one for whom they have lost respect.

It comes as no surprise to us when, on occasion, jurors who, after the rendition of verdict stay to talk with us, comment: "That lawyer was fresh. We're glad you didn't take it from him and showed him who's running the Court."

Because Mr. Stearns tirelessly inveighs against us and repeatedly accuses the Court of invading the province of the jury, we are constrained to set out the pertinent portions of the charge which conclusively show that we made the jury profoundly aware that they, not the Judge, were the triers of fact. [T]he one and only factor that you are exclusively bound by under your oath [is] the facts, as you, the jury, find them to be, and the law applicable to those facts.

.    .    .    .    .

**2.** Mr. Stearns states only the following in his Memorandum of Law: "That interjection [question put to Dr. Seaman] further prompted the exchange which follows, on pages 84 through 86 of the transcript, in which defendant's counsel's invited exception to the Court's comment was characterized by the trial judge as 'insolence' . . . .." Defendant's Memorandum of Law at 8.

**3.** We said to Dr. Seaman during his cross-examination: "There come a time when I have to charge the jury on the law and I have to know what the facts are in order to be able to sensibly charge the jury as to the law," Transcript of Jan. 8, 1980 at 87, in explanation of why we were persistent in obtaining his answers to our questions. Needless to add, this extract is also not mentioned by Mr. Stearns.

[T]he only triumph in any litigation, whether its nature be civil or criminal, is the triumph of the truth. Neither you nor I are here to please anybody. . . . We have a sworn duty to perform and must discharge it with honor, if justice is to prevail.

.    .    .    .    .

[You are equipped] with an education in life, and that is what you bring into the jury box, that all-important decision-making power which constitutes a great and powerful arm of the law.[4]

.    .    .    .    .

That is where your function comes in, to pick out what is meaningful or convincing to you. As I so often tell jurors, when you walk into a courtroom and are selected for jury duty, you do not leave your common sense outside.[5]

.    .    .    .    .

Under our system of justice, the Court and the jury have distinct and separate functions to perform, each independent of the other to a large degree. . . .

I am not going to decide the facts, neither are counsel. That is exclusively your sworn obligation. It is your burden. You have to decide where truth lies. I will not let anyone interfere with your function. You and only you—not the Judge, not the attorneys—are the sole and exclusive judges of the facts, and that is your paramount duty. I repeated that several times during the course of your selection.

You and only you—not the Judge, not the lawyers—determine the weight of the evidence. You and you alone determine the believability of each witness, and only the jury can resolve such conflicts as there may be in the evidence. It is my function to instruct you as to the law with respect to the claims here asserted. Each proposition of law that I give you must, and I empha-

size must—not may, must be applied to the factual situation to which it relates.[6]

.    .    .    .    .

[A] federal trial Judge has the power to comment on the evidence. . . . I have the power to tell you my impression of every one of the witnesses who testified [unlike in the State Court]. I have the power to comment on the weight that I believe a document here and there should be given. I can express my doubt as to any phase of the total trial record. I can say at trial that this one falsified or that I would not believe that one on a stack of Bibles. . . . [o]r as to another witness, that he spoke the gospel truth, so long as I say "But you are the judges of the facts."

I have never done that in any case over which I have presided. . . . I am quite confident I never shall, for the simple reason that I refuse to believe that if I were to give you my estimate of the evidence on this point or that point, that you would not be impressed by it, at least one of you, if not more, and I do not want to invade your orbit of factfinding.

So, since I have a perfect right to comment on the evidence if I chose to do it, and I am not doing it, I do not want you, and I forbid you, from reading into the tone of my voice, or the emphasis that I put on one proposition or another proposition of law, as to how I feel about the facts. If I wanted to tell you, I would tell you right out, because the law gives me the power to do exactly that.

I do not sit as a judge and then turn my head away at something that is unacceptable to me, or make some facial expression which shows my disbelief. There are a hundred ways that that can be done. That is unbecoming and an unwarranted thrust at the laudable objectives of the law. . . [W]hen you have a perfect right to go up the front way, you go up that way, you do not go sneaking around the back. So, if I

---

4. Charge at 3-4.

5. *Id.* at 7.

6. *Id.* at 8-9.

wanted to tell you my impression of the facts, I would go right up the front way.[7]

Under our system, then, you, as American ministers of justice, must always bear in mind that each one of these litigants is entitled to even-handed justice. They stand equal before you. You must not allow sympathy or bias or prejudice to play any part whatsoever in your determination of the case. . . .

You swore, and that is what I exacted from each one of you, that that is exactly what you would do: that you would predicate your verdict exclusively on the facts and on the law.[8]
The fact that I charge you in regard to damages does not mean to infer for a moment that I'm saying you should find damages. That is entirely up to you.[9] You apply such criteria [common sense] as you sum up the impressions of any witness who took the stand before you, and that includes the doctors. You do the assessing, and that is up to you all the way down the line.

So all I can beseech you to do . . . in regard to your obligation, among other things, is to assess the testimony. All I can do is beseech you to ponder and to reflect on possible inconsistencies in the testimony of the witnesses which may or may not cause the jury to discredit testimony.[10]

What weight is to be given it [any deposition read] is entirely within your province.

The case is being submitted to you with the confidence on the part of the Court that the oath of office that you took as jurors to fairly and impartially pass upon the evidence will be faithfully observed.[11]

And so, Mr. Foreman, ladies and gentlemen of the jury, you, as the judges of the facts, must stand up for your convictions as you argue among yourselves, in order to do justice. . . . Discuss and weigh your respective opinions dispassionately, without regard to prejudice, favor, bias for either side, and adopt that conclusion which in your good common sense, and under your oath, appears to be in accordance with the truth. . . .

So you adopt the factual conclusions that seem proper, if you can do so without violence to your own individual judgment, and apply that high degree of genuine courage that you justly expect from your public officials, especially in these perilous times.

I commend you to the faithful performance of your sworn duty. Putting that in simple language, that is without fear or favor to any man, you are to well and truly try the issues in this case between this plaintiff and this defendant according to the evidence presented to you in open court and under the applicable law as stated to you by the Court. I point out to you, with all the emphasis that I can summon, that in your deliberations in the jury room there can be absolutely no triumph either for the spirit or the letter of justice except in the ascertainment, the declaration, the pronouncement of the truth as you find it to be.

That really, in essence, is your mission. . . .[12]

## Conclusion

The applications for judgment notwithstanding the verdict or a new trial on the issue of maintenance and cure and for a new trial on the issue of seaworthiness are denied. With respect to the claim for maintenance and cure, we direct plaintiff to file, within fifteen (15) days of the filing of this order, a remittitur in the sum of twenty-nine thousand two hundred dollars ($29,-200); otherwise the issue of maintenance

---

**7.** *Id.* at 10–11.

**8.** *Id.* at 14–15.

**9.** *Id.* at 47.

**10.** *Id.* at 58.

**11.** *Id.* at 63–64.

**12.** *Id.* at 65–66.

and cure shall be retried. All other motions for further relief, addressed to the total trial record and verdict, are denied.

SO ORDERED.