Charles **GILLIKIN,** Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**No. 85 CV 2582 (TCP).**

United States District Court,
E.D. New York.

Feb. 25, 1991.

Paul C. Matthews, New York City, for plaintiff.

Damon C. Miller, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

On March 14, 1984, plaintiff Gillikin was an able-bodied seaman aboard the U.S.N.S. MAUMEE, an 85 class tanker, owned by the defendant, the United States, and operated by the Military Sealift Command through a contract operator.[1] On that day, Gillikin injured his knee while performing his duties during one of the MAUMEE's transatlantic military missions.

He brought the present action under the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–52 (1982) (the "SAA"), and the Public Vessels Act, 46 U.S.C.App. §§ 781–90 (1982) (the "PVA"), seeking recovery on three theories, 1) Jones Act negligence, 2) unseaworthiness and 3) maintenance and cure. These claims were tried to this Court and, by its Amended Memorandum and Order, dated November 7, 1989, it denied the first two claims. However, it granted the Gillikin's claim for maintenance. The United States now moves this Court pursuant to Fed.R.Civ.P. 59(e) for an order modifying the judgment entered by the Clerk of the Court on November 21, 1989. For the following reasons, that motion is now granted in part and denied in part.

I. *The Applicability of the Maintenance Rate Contained in the Collective Bargaining Agreement*

Section 44 of the collective bargaining agreement negotiated by Gillikin's union

---

1. A complete account of the circumstances underlying this suit is laid out in this Court's amended Memorandum and Order, dated November 7, 1989.

provides that union members are entitled to receive maintenance payments at the rate of eight dollars per day. In its Amended Memorandum and Order, this Court determined that this rate was unconscionably low and refused to enforce it. Instead, it awarded Gillikin maintenance based upon the room and meal allowances contained in the same collective bargaining agreement. Amended Memorandum and Order, dated November 7, 1989, at 9. The United States now argues that this refusal was improper and that this Court is bound to enforce the maintenance rate specified in the collective bargaining agreement.

█ The right to maintenance entitles a seaman taken ill or injured in service to a vessel to collect support payments from the vessel's owner without regard to fault on the part of the owner. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). These payments are intended to compensate the seaman for the cost of food and lodging comparable to that which he would have received aboard ship had he not been incapacitated. *Id.* The right to maintenance continues until the seaman recovers or his condition permanently stabilizes, a state known as "maximum cure." *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962).

█ The right of maintenance is ancient, dating back to the medieval sea codes. Gilmore & Black, *The Law of Admiralty*, § 6.6 (2d ed. 1975). In this country, it has existed as a matter of federal common law since the early nineteenth century. *Harden v. Gordon*, 11 Fed.Cas. n. 6047, p. 480, 483 (C.C.D.Me.1823) (Story, J.). As originally formulated, the right of maintenance was intended to protect seaman put ashore "poor and friendless" in alien ports from "the accumulated evils of disease, and poverty" as well as from their own "habits of gross indulgence, carelessness and improvidence." *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 728, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943) (quoting *Harden v. Gordon, supra*). It was also designed to provide an incentive for shipowners to look after the health and welfare of their seamen as well as an incentive for prospective seamen to enter into this sometimes dangerous but important industry. *Id.* The "broad and beneficial purposes" underlying the right have led courts to guard its boundaries closely and to avoid fine distinctions which might diminish its scope. Doubts or ambiguities relating to the right must be resolved in favor of the seaman. *Vaughan, supra*, 369 U.S. at 531–32, 82 S.Ct. at 1000; *Aguilar, supra*, 318 U.S. at 735–36, 63 S.Ct. at 936. Although it has its origin in a relationship which is contractual in nature, in the past the right has not itself been regarded as contractual. *Cortes v. Baltimore Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932). Rather, the shipowner's obligation to pay maintenance was deemed to have been imposed by law and thus to be beyond contractual "abrogation." *De Zon v. American President Lines*, 318 U.S. 660, 667, 63 S.Ct. 814, 818, 87 L.Ed. 1065 (1943); *Cortes, supra*, 287 U.S. at 371, 53 S.Ct. at 174.

█ Several circuits have considered the issue of whether a court must enforce a rate of maintenance specified in a collective bargaining agreement even though that rate is not capable of providing the seaman with food and lodging comparable to that enjoyed aboard ship. Of these, three have come to the conclusion that while they may not abrogate the right completely, such agreements may substantially "modify" it. The most complete statement of the rationale underlying these decisions is laid out in *Gardiner v. Sea–Land Service, Inc.*, 786 F.2d 943 (9th Cir.1986), which enforced a contractually specified maintenance rate of eight dollars a day. Although it noted that the right to maintenance was beyond contractual abrogation, *Gardiner* held that a seafarer's union could properly submit the right to maintenance to the collective negotiation process. *Id.* at 949. Moreover, it held that, when challenged by a union member, the rate contained in the agreement eventually produced by such negotiations could not be judged in isolation, but rather only in relation to the total package of benefits provided by the agreement. *Id.* Where such agreements reduced the rate

of maintenance payments below the level necessary to provide comparable food and shelter, they could not be considered to have "abrogated" that right so long as it was clear that a genuine "quid pro quo" had been received through collective bargaining. *Id.* Only where a seaman could show that the collective bargaining agreement as a whole was unfair or where he could show that the rate provided was no more than a token *and* that the union had received no significant quid pro quo for surrender of the right, could he avoid the specified rate. *Id.* at 949–950.

Although it held that the federal labor laws did not preempt the maritime rate of maintenance, the Ninth Circuit nevertheless argued that its holding was compelled by the dictates of federal labor policy. *Id.* at 947–48. If collective bargaining agreements were not permitted to regulate the broadest possible array of rights related to the employment relationship, it felt that two of the aims of federal labor policy, the promotion of industrial peace and the collective economic empowerment of workers would be unjustifiably threatened. *Id.* at 949–50.

This reasoning was later adopted by decisions of the First and Sixth Circuits. See *Macedo v. F/V PAUL AND MICHELLE,* 868 F.2d 519 (1st Cir.1989) ($10.00 daily rate); *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585 (6th Cir.1989) ($8.00 daily rate).

In *Barnes v. Andover Co.,* 900 F.2d 630 (3rd Cir.1990), the Third Circuit adopted a different approach. Refusing to enforce an eight dollar daily rate, the *Barnes* court first held that the right to maintenance was not purely a contractual one and historically had been considered beyond contractual abrogation. *Id.* at 636–37. It noted that the policies which traditionally underlay the right might very well have little relevance in the case of unionized seamen whose union membership renders them neither friendless nor improvident. *Id.* It did not, however, feel that the emergence of unions allowed it to disregard its longstanding obligation to guard the interests of seaman,

who remained "wards of the admiralty." *Id.* at 637.

Like *Gardiner, Barnes* also found that the federal labor laws did not preempt the right of maintenance. *Id.* at 637–39. Unlike the Ninth Circuit, however, the Third Circuit refused to accord dispositive significance to the federal policy favoring full enforcement of collective bargaining agreements. *Id.* at 640. Finding no authority for what it termed a doctrine of "quasi-preemption," *Barnes* refused to enforce an agreed rate of maintenance which it deemed inadequate. *Id.* Absent some indication of Congressional intent, it did not feel that it could allow a private contract to "override" a common law right of such longstanding. *Id.*

Based upon its reading of these cases, this Court concludes that the approach outlined in *Barnes* is the proper one. The source and substance of the right to maintenance direct that Gillikin's recovery may not be limited to eight dollars per day on the ground that that is the rate mandated by the collective bargaining agreement.

The right to maintenance springs from maritime law and not from the contract of employment. As a result, it is beyond the power of private parties to abrogate the right by contract.

> Contractual [the right of maintenance and cure] is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, *no agreement is competent to abrogate the incident* .... The duty [to provide maintenance and cure] is one annexed by law to a relation, and annexed as an inseparable incident *without heed to any expression of will of the contracting parties.*

*Cortes v. Baltimore Insular Line,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932) (Cardozo, J.) (emphasis added); *accord, Vaughan, supra,* 369 U.S. at 531–32, 82 S.Ct. at 1000; *De Zon, supra,* 318 U.S. at 667, 63 S.Ct. at 618; *Dryden v. Ocean Accident & Guarantee Corp.,* 138 F.2d 291, 292 (7th Cir.1943). Thus, any provision of a contract which purports to abrogate this right will be unenforceable.

In substance, the right to maintenance is more than the right of the sick or injured seaman to some support payment from the shipowner. It is the right to a payment which in fact can provide a given quality of food and lodging during the period of incapacitation and recuperation, one comparable to that enjoyed aboard ship. Where the payments provided by a shipowner are in fact insufficient to provide that quality of food and lodging, the right to maintenance must be said to have been abrogated rather than merely modified. *Rutherford v. Sea–Land Services, Inc.,* 575 F.Supp. 1365, 1372 (N.D.Cal.1983). *See also Barnes, supra,* 900 F.2d at 637. A contractual provision which seeks to authorize such an inadequate level of payments therefore abrogates the right to maintenance and may not be enforced. This conclusion is reinforced by the Supreme Court's frequent pronouncements that the right is not to be limited through the application of fine distinctions and that all ambiguities must be resolved in favor of the seaman.

Those decisions which have enforced collectively bargained provisions specifying such inadequate rates rest upon premises inconsistent with the frequent holdings of the Supreme Court that the right to maintenance may not abrogated. The *Gardiner* approach, which would allow the right to be the subject of unrestricted negotiations, so long as some rate is specified, would allow the parties to a collective bargaining agreement to achieve in practical terms that which they may not achieve in formal ones. For instance, payments of one dollar or less a day would not completely abrogate the right to receive some payment, but few would contend that such a rate does not effectively deprive a seaman of the right to maintenance. Nowhere in the United States can such a sum purchase even a single square meal, much less three such meals and a bed. It is simply inconsistent with the spirit of *Cortes* and subsequent cases to suggest that although formal abrogation of the right lies beyond the power of private parties, such parties may agree to reduce it to a meaningless token. Additionally, contrary to the position taken in *Gardiner,* this Court can find no authority for the proposition that such power evolves if the agreement containing the token rate is fair as a whole or if it appears that the seaman's union got value for surrender of portions of the required payments. Certainly, the decisions of the Supreme Court do not suggest that such is the case.

The prospect of such drastic "modifications" may, of course, be eliminated by the imposition of a judicially created floor below which the rate of maintenance may not be negotiated. *See Grove v. Dixie Carriers, Inc.,* 553 F.Supp. 777, 780 (E.D.La. 1982). Set at some "reasonable" level, this floor would assure that the maintenance paid to the seaman constituted a meaningful contribution to the expense of food and lodging comparable to that enjoyed aboard ship and not merely a token sum. Allowing any downward modification of the right to maintenance would, of course, conflict with this Court's position that such "modification" constitutes abrogation. Even if one does not accept this conclusion, however, it is clear that adoption of the *Grove* approach would likely produce more problems than it would solve. It would require courts confronted with a collective bargaining agreement which alters the rate of maintenance to conduct a burdensome and entirely standardless inquiry whose outcome would be unpredictable and largely judge-dependent. No ready definition of what constitutes a "meaningful" or "reasonable" contribution in this context is known to this Court. Of course, standards may develop over time, but even then, the inherent flexibility of these terms will likely deprive parties who seek to bargain over reduced maintenance rates of the benefits of certainty that the collective bargaining agreement is intended to provide. Parties to collective bargaining agreements would not be able to conclude with any certainty that the rate agreed to would be enforced. Indeed, even where the agreed rate actually was "reasonable", the vagueness of these terms would present an open invitation to dissatisfied or simply greedy seamen to litigate their claims.

Moreover, this approach might not leave significant room for downward modifications. For instance, if obliged to apply it, this Court could not conclude that a rate of maintenance insufficient to provide even the most basic level of food and lodging was a reasonable rate. Since, by and large, seaman do not live in luxury aboard ship, in most cases, they would not be entitled to much more than such a basic rate. While unions would be free to negotiate the rate of maintenance up, they would not have much leeway to negotiate it down.

Finally, the policy which all of these approaches are designed to accommodate, that which favors collective bargaining and encourages the enforcement of collective bargaining agreements does not require that the right to maintenance be subject to this process. In the absence of preemption by the federal labor laws, which no court has found in this situation and which the United States here does not suggest, there is no authority for allowing a general federal policy to so restrict a common law maritime right. *Barnes, supra*, 900 F.2d at 640.

Additionally, federal labor policy is not the only federal policy which impacts on this Court's decision. Traditionally, seaman have been considered "wards of the admiralty" and the federal courts, the guardians of their interests. Although unions have undoubtedly reduced the historic vulnerabilities of seamen, their status as wards of courts sitting in admiralty has yet to be revised. Until such time as it is, this Court may not abdicate its role as a seaman's guardian.

It also should be noted that refusal to allow the rate of maintenance to be bargained below the level required to provide food and lodging comparable to that provided aboard ship does not threaten to upset the collective bargaining process or to undermine peace in the shipping industry. The parties would still be free to bargain the rate of maintenance above this fundamental level. Additionally, removal of this right from collective bargaining would hardly serve as a precedent for the removal of others. A common law right centuries old, which the Supreme Court has indicated was not subject to contractual abrogation, it can hardly be analogized to the vast majority of rights which such agreements regulate.

■ It was the finding of this Court that the rate of maintenance specified by the collective bargaining agreement, eight dollars per day, was not sufficient to provide the plaintiff with food and lodging comparable to that which he would have received aboard the MAUMEE. Thus, because it cannot provide the requisite support, this Court is compelled to conclude that the agreed rate abrogates Gillikin's right to maintenance and therefore that it may not enforce that rate. *See Barnes v. Andover Co.*, 900 F.2d 630, 637, 640 (3rd Cir.1990); *Rutherford v. Sea Land Service, Inc.*, 575 F.Supp. 1365, 1372 (N.D.Cal.1983).

II. *The Amount of Maintenance*

■ The United States also challenges this Court's award of maintenance on the ground that the plaintiff has failed to introduce any evidence to support such an award. Although the burden is "feather light," the plaintiff must provide the Court with an evidentiary basis for an award of maintenance. *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986); *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 91 (5th Cir.1984). So light is this burden that it may be satisfied by the seaman's own testimony concerning his actual expenditures or concerning the reasonable cost of food and lodging in his area. *Yelverton*, 782 F.2d at 558. Absent such an evidentiary basis, maintenance may not be awarded. *Id.*

Gillikin does not dispute the government's assertion that he has provided no evidence of his actual food and lodging expenses. While such evidence would be the most probative for purposes of determining an award of maintenance, however, a court may award maintenance based upon other less-probative forms of evidence. *See Morel v. Sabine Towing & Transp. Co.*, 669 F.2d 345, 347 (5th Cir. 1982). Evidence which indicates no more

than what the shipowner routinely paid seamen for food and lodging or what the reasonable cost of such items in the community where the seaman lives have been found sufficient to support awards of maintenance. *See Harper, supra,* 741 F.2d at 91; *Morel, supra,* 669 F.2d at 347. In this case, the provisions of the collective bargaining agreement which specify the amount to be paid to seamen for their on-shore living expenses might well be sufficient to support the award initially made by this Court. Unlike the circuit courts which issued the decisions cited above, this Court need not rely upon only such marginally probative evidence as has previously been submitted, but rather may seek the submission of the most probative evidence available.

For that reason, this Court now reserves decision on the question of the amount of maintenance due to the plaintiff and orders that, within thirty days of the entry of this Order, the plaintiff shall submit an affidavit or other evidence establishing to the extent possible his actual expenditures for food and lodging during this period. The United States shall thereafter have fifteen days to submit a response to these materials.

III. *The Date of Maximum Cure*

 The United States next challenges this Court's determination of the point at which Gillikin reached a state of maximum cure.

It is well-settled that a shipowner must provide an injured seaman with maintenance and cure until such time as the seaman has been "declared" to have reached a state of maximum cure. *Vella v. Ford Motor Co.,* 421 U.S. 1, 4–5, 95 S.Ct. 1381, 1383–84, 43 L.Ed.2d 682 (1975) (citing the Shipowners Liability Convention of 1936, 54 Stat. 1693, 1696). This "declaration" must take the form of a medical diagnosis made by the physicians charged with the care and treatment of the injured seaman. *Id.* at 4 & 5 n. 5, 95 S.Ct. at 1383 & 1384 n. 5 (citing *Vitco v. Joncich,* 130 F.Supp. 945, 949 (S.D.Cal.1955), *aff'd,* 234 F.2d 161 (9th Cir.1956)). Whether and at what point

such a "declaration" has been made is a question of fact to be resolved by the trier of fact. *See Thomas v. Diamond M Drilling Co.,* 569 F.2d 926, 928 (5th Cir.1978). As the trier of fact in this case, this Court accepted the testimony of Dr. Leo Koven that Gillikin reached a state of maximum cure on February 14, 1989. The United States now contends that Dr. Koven's "declaration" was preceded by the 1985 "declaration" of an administrative law judge who issued a decision finding that Gillikin was not disabled within the meaning of the Social Security Act.

That contention cannot be sustained. According to the decision of the administrative law judge, the Social Security Act defines "disability" to mean the "inability to engage in any substantial gainful activity due to physical or mental impairment(s) which can be expected to either result in death or last for a continuous period of not less than twelve months." Defendant's Ex. G at 4. Although he determined that Gillikin's injuries rendered him "disabled" in this sense and would continue to do so until 1988, at no point did the administrative law judge find that Gillikin's condition had permanently stabilized or that it could not further improve. Thus, the decision is simply not a declaration that the Gillikin had reached a state of maximum cure. In the absence of evidence of another such declaration, this court was therefore free to accept Dr. Koven's testimony as the first declaration that plaintiff had reached a state of maximum cure.

IV. *Interest*

 This Court awarded Gillikin pre-judgement interest on every late eight dollar daily payment at a rate equal to the average yield of six-month treasury bills during the late payment period. Amended Memorandum and Order, at 9–10. The United States now argues that such an award is barred by the terms of the PVA. It is correct.

The U.S.N.S. MAUMEE is a government owned vessel with a military mission. As such it is a "public vessel." *Blevins v. United States,* 769 F.2d 175, 180 (4th Cir.

1985) (any vessel owned by United States and not chartered to carry cargo for private shippers is "public vessel"). As a public vessel, any claims involving it are governed by the provisions of both the SAA and the PVA. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 180–81, 96 S.Ct. 1319, 1329–30, 47 L.Ed.2d 653 (1976); *Blevins,* 769 F.2d at 180 n. 2. Where the terms of those two acts conflict, the terms of the PVA control the action. *United Continental Tuna Corp.*, 425 U.S. at 181, 96 S.Ct. at 1329.

The PVA explicitly bars awards of prejudgment interest, unless expressly provided for by contract. *See* 46 U.S.C. § 782 (1988); *Gretchen v. United States,* 618 F.2d 177, 178 n. 2 (2nd Cir.1980). The PVA does not specifically address the availability of post-judgment interest. The SAA, however, allows such interest to be awarded, but limits the rate of interest to 4% per annum. *See* 46 U.S.C. § 743 (1988).

Based on the foregoing, this Court's award of prejudgment interest to the plaintiff must be, and hereby is, vacated. Additionally, any interest upon the judgment, once it is entered must be, and hereby is, limited to the rate of 4% per annum.

## V. *Attorney's Fees*

In its Amended Memorandum and Order, this Court found that defendants' agents had willfully and inexcusably withheld from Gillikin even those payments which it acknowledged were due to him under the collective bargaining agreement. As a result, it awarded Gillikin an amount equal to ⅓ of the difference between the aggregate of the eight dollar daily payments which were made to him and the $37.00 daily payments which it determined should have been made, together with interest to compensate him for the cost of retaining an attorney to collect the moneys owed him. See Memorandum and Order dated November 21, 1989. Although there is clear authority for such an award against a private party, *see Vaughan v. Atkinson,* 369 U.S. 527, 530–31, 82 S.Ct. 997, 999–1000, 8 L.Ed.2d 88 (1962), the United States now contends that, as the

sovereign, it is immune from such awards unless some statute specifically grants Gillikin the right to attorneys fees. Because neither the SAA or the PVA grants such a right, it concludes that this Court was without authority in awarding Gillikin such a fee.

The United States is correct in its contention that counsel fees may not be awarded against the United States in the absence of specific statutory authority. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 267–68, 95 S.Ct. 1612, 1626–27, 44 L.Ed.2d 141 (1975); *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1363 (D.C.Cir. 1977). An examination of the terms of the PVA and the SAA reveals no provisions which explicitly authorize such an award. This Court therefore concludes that its award of attorney's fees at this stage of the litigation was premature. It notes, however, that Gillikin may well be entitled to seek such an award in the future. The Equal Access to Justice Act, 28 U.S.C. § 2412 (1988) (the "EAJA"), explicitly grants courts discretion to award such fees against the United States in any civil action "to the same extent any other party would be liable under common law." *Id.* § 2412(b). Given that attorney's fees are generally available to plaintiffs who can show that a private defendant willfully withheld maintenance payments, *Vaughan, supra,* 369 U.S. at 530–31, 82 S.Ct. at 999–1000, it would appear that the United States may well be liable for such a fee in this case. It should also be noted that the EAJA makes such an award mandatory where the United States is unable to show that the position it has taken was not substantially justified. 28 U.S.C. § 2412(d) (1988).

An award of fees pursuant to this statute may not, however, be made until this litigation has concluded. The EAJA allows such fees to be awarded only to the "prevailing party" in the litigation. *See id.* According to the statute, the "prevailing party" may not be identified until a final, unappealable judgment has been entered. *See id.* § 2412(d)(2)(H). In the case of a mandatory award, there are other filing and pleading requirements which have yet

to be met in this case. *See id.* § 2412(d)(1)(B).

For the foregoing reasons, that portion of the Amended Memorandum and Order which purports to grant such fees must be, and hereby is, vacated. Once a final judgement has been entered, if he is the prevailing party, Gillikin will be free to petition for an award of such fees. This Court, of course, expresses no opinion concerning the merits of any such claim.

SO ORDERED.