Gary AMMAR, Plaintiff–Appellant–Cross–Appellee,

v.

UNITED STATES of America, Defendant–Appellee–Cross–Appellant,

Bay Ship Management, Inc., Defendant.

Docket Nos. 02–6047, 02–6048.

United States Court of Appeals, Second Circuit.

Argued: Jan. 16, 2003.

Decided: Aug. 29, 2003.

Barbara Matthews, New York, New York (Paul C. Matthews, New York, New York, on the brief) for Plaintiff–Appellant–Cross–Appellee.

John Ingram, New York, New York (Julie Pateman Ward, Healy & Baillie, New York, New York; Robert D. McCallum, Jr., Assistant Attorney General, Debra J. Kossow, Senior Admiralty Counsel, United States Department of Justice, Washington, D.C.; Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, New York, on the brief) for Defendant–Appellee–Cross–Appellant.

Before: VAN GRAAFEILAND, KEARSE, and B.D. PARKER, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Gary Ammar appeals from a judgment entered in the United States District Court for the Eastern District of New York, following a bench trial before Reena Raggi, then-*District Judge,* awarding him $364,309 against defendant United States under the Jones Act, 46 U.S.C.App. § 688, and general principles of maritime law, for injuries sustained as a result of negligence and unseaworthiness while working as a seaman on a United States naval ship. The district court found that Ammar's injuries were caused in part by negligence on the part of Ammar himself, and it pro tanto reduced his recovery for pain and suffering, lost wages, and medical expenses. The court also ruled that Ammar was entitled to $18 per day in maintenance. On appeal, Ammar contends principally that the court erred (a) in finding him contributorily negligent and reducing his recovery for that reason, and (b) in denying him any recovery for certain of his medical bills. The United States cross-appeals from so much of the judgment as (a) awarded Ammar maintenance in excess of the daily amount specified in the collective bargaining agreement covering his employment, and (b) failed to discount to present value the amount awarded for future wages and future medical expenses. For the reasons that follow, we find merit in the cross-appeal, but not in the appeal.

## I.  BACKGROUND

The facts material to these appeals are now largely undisputed. In January 1999, Ammar, a member of the Seafarers International Union, was a bosun aboard the *Gordon,* a United States Naval Ship stationed in the Persian Gulf in a convoy with other Military Sealift Command vessels. The *Gordon* was managed by Bay Ship Management Inc. ("BSM"), which was originally a defendant to this suit but which was dismissed prior to trial on the ground that, under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and the Public Vessels Act, 46 U.S.C. §§ 781–790, Ammar's exclusive remedy, if any, was against the United States.

### A.  The Events

One of Ammar's duties aboard the *Gordon* was operation of a shipboard crane, a duty he had performed hundreds of times. The crane consists of two major components, the turret and the boom; the turret contains virtually all of the crane's controls and is mounted on a round pedestal affixed to the ship; the turret is capable of revolving 360 degrees in either direction. The crane normally can be operated either by using the controls mounted on it or by means of a remote control "chest-pack." The crane-mounted controls can be accessed from the third-level deck ("03 deck") of the ship adjacent to the turret. The chest-pack is connected to the crane by an electric "umbilical cord" and allows the crane to be operated from a distance.

On January 29, 1999, there was damage to the umbilical cord of a starboard crane (the "starboard stores crane") that was normally used to lower machinery, food, and other supplies from the dock or a supply boat into the *Gordon*'s engine room through a hatch on the ship's second-level deck ("02 deck"). The remote control for the starboard stores crane was thus inoperable. Although Ammar and others were aware that the chest-pack was inoperable, the crane was not "red-tagged" to warn against attempting to operate the crane by using the controls mounted on it.

At approximately 6:00 p.m. on January 29, 1999, Ammar undertook to maneuver

the starboard stores crane so as to move its hook into position to remove the 02 deck hatch cover in order to enable the crew to lower supplies from the 03 deck to the engine room. In so doing, Ammar stood in a precarious position on the crane's pedestal, and in attempting to get down from the pedestal, he stepped on a small box, called the "remote control box," that was mounted on the pedestal. That box was not meant to bear such weight, and when Ammar stepped on it, it gave way. His left foot was caught between a metal bracket and a hydraulic pump, resulting in, *inter alia*, a sprained ankle and a two-inch gash in his calf. Ammar, then age 57, was not able to return to his work as a seaman.

Ammar received medical treatment for his injuries over the next several years, along with psychiatric care. The United States or BSM paid for most of his medical expenses and, through the commencement of trial, paid him maintenance of $8 per day, the rate specified in the collective bargaining agreement covering his employment.

## B. *The Decision of the District Court*

Ammar commenced the present action under the Jones Act, 46 U.S.C.App. § 688, as well as the general maritime law of the United States, seeking damages for, *inter alia*, pain and suffering, medical bills, and lost wages. The complaint also sought maintenance payments in excess of the amount Ammar had been paid by the United States or BSM, alleging that his daily living expenses substantially exceeded that amount. Prior to trial, the parties settled Ammar's claims for lost wages through May 1999.

At a bench trial in October 2001, the district court heard extensive testimony as to, *inter alia*, the technical operation of the starboard stores crane, the circumstances surrounding the January 29 accident, Ammar's medical problems, his treatment by various medical professionals, and other damages and payment issues. The witnesses included members of the ship's personnel, persons familiar with the operation of the crane, medical experts for both sides, and Ammar himself.

After the close of the evidence and the parties' summations, the court announced its liability findings and its tentative findings as to damages on the record on October 30, 2001 (*see* Hearing Transcript, October 30, 2001 ("Oct. 30 Tr."), at 1–28), and finalized its damages findings at a subsequent hearing on December 5, 2001 (*see* Hearing Transcript, December 5, 2001 ("Dec. 5 Tr."), at 23–45, 50–51, 55–62). The court found that at the time of the accident, the *Gordon* was unseaworthy because the starboard stores crane's remote control chest-pack was inoperable, and there was no safe way to operate the crane-mounted controls from the crane while maintaining the necessary lines of sight for the proper positioning of the boom; the court found that the United States was derelict in its duties because it had failed to adopt any of three alternative methods of avoiding injury to the seamen, to wit, (a) keeping the chest-pack in repair, (b) red-tagging the crane to warn workers against using it before the necessary repairs had been made, or (c) giving an unequivocal order that the crane not be used. However, the court also found that Ammar could have avoided his accident by standing on a rung of the railing of the 03 deck to reach the on-crane controls, rather than standing on the crane's pedestal and stepping on the flimsy remote control box. The court found that Ammar's task could have been performed entirely from that on-deck position; that that was a safer alternative; that Ammar knew that option was available to him; and that his failure

to adopt that alternative was an unreasonable choice that contributed to his accident. The court apportioned responsibility for the accident 60% to the United States and 40% to Ammar.

Turning to the matter of damages, the district court found that, but for the accident, Ammar would have worked until he reached the age of 65 and that he lost wages through April 2006, the month of his 65th birthday. The court also found that had Ammar worked until age 65, he would have qualified for a pension—a goal he had expressed before joining the crew of the *Gordon*—and that he was entitled to payment for his lost pension for a period of 13.5 years, based on life expectancy actuarial tables. The court found that Ammar was entitled to damages for pain and suffering, past and future. With respect to the medical expenses claimed by Ammar in excess of the bills the United States had already paid, the court rejected the testimony of certain doctors as to Ammar's mental condition, and it found that certain of the medical charges appeared to have been inflated for purposes of the litigation.

The court ultimately fixed the amount of lost wages (after taxes) at $294,000, the lost pension at $30,849 (the cost of an appropriate annuity), pain and suffering at $250,000, and allowable future medical expenses at $3,900; and it reduced these amounts by 40% on account of Ammar's contributory negligence. Although the court initially indicated that it would discount to present value the amounts to be awarded for future damages, the court ultimately decided, as discussed in greater detail in Part III.B. below, that it would not discount those sums.

Finally, the court determined that Ammar should be paid maintenance at the rate of $18 per day. Section 13 of the collective bargaining agreement between BSM and the Seafarers International Union (the "Union"), of which Ammar is a member, provides that when a member of the Union is entitled to maintenance, the rate is to be $8 per day regardless of the actual expenses incurred for his food and lodging:

> MAINTENANCE AND CURE. When a member of the Unlicensed Personnel is entitled to Maintenance and Cure under Maritime Law, he shall be paid maintenance at the rate of eight dollars ($8.00) per day for each day or part thereof of entitlement. The payment due hereunder shall be paid to the man weekly. This payment shall be made regardless of whether he has or has not retained an attorney, filed a claim for damages, or taken any other steps to that end and irrespective of any insurance arrangements in effect between the Company and any insurer.

Relying on this provision, the United States had argued prior to trial that the amount of maintenance to which Ammar was entitled was thus limited to $8 per day. The district court had rejected this argument, observing that, although this Court had not ruled on that question, the Court of Appeals for the Third Circuit and a number of district judges within this Circuit had concluded that

> the special care that the maritime law has always paid to seamen basically preclude[s] parties from contracting away an individual seaman's right to full maintenance. This cannot be abrogated by private agreement. And, so, the history and purpose of maintenance [a]s a right created by the courts to protect individual seamen is simply not something that unions and employers can try to minimize.

(Hearing Transcript, December 15, 2000, at 18.) Although noting that courts of appeals for several other circuits had ruled to the contrary, the district court here

found the above view preferable. In light of the evidence presented at trial, the court found that the appropriate rate of maintenance here was $18 per day. Taking into account the maintenance payments already made to Ammar, the court awarded him additional maintenance of $15,500.

Judgment was eventually entered in favor of Ammar against the United States in the amount of $364,309. This appeal and cross-appeal followed.

## II. AMMAR'S APPEAL

On appeal, Ammar contends principally (a) that the district court made errors of law by applying principles of assumption of risk rather than principles of comparative negligence, and (b) that the court's factual findings were clearly erroneous as to methods of operating the starboard stores crane, the existence of options available to Ammar, and negligence on the part of Ammar. He also contends that the court erred in refusing to award the full amount of his claimed medical expenses. His contentions have no merit.

### A. *Application of the Doctrine of Comparative Liability*

■ Ammar contends that the district court, in reducing his damages award, mistakenly applied principles of assumption of risk rather than contributory negligence or comparative negligence. We see no indication that this is so.

■ Assumption of risk is "the knowledgeable acceptance by an employee of a dangerous condition when and if such acceptance was necessary for the performance of his duties." *Rivera v. Farrell Lines, Inc.*, 474 F.2d 255, 257 (2d Cir.1973) ("*Rivera*"). Assumption of risk has long been eliminated from maritime injury law by statute. *See id.* at 256–57 (citing 35

Stat. 66 (1908), 45 U.S.C. § 54 (1946) (railroad employees), *as amended*, 53 Stat. 1404 (1939), 45 U.S.C. § 54 (1946), made applicable to seamen by 41 Stat. 1007 (1920), 46 U.S.C.App. § 688 (1946)).

■ Instead, the Jones Act incorporates the doctrine of comparative negligence, under which recovery is reduced if the plaintiff is found to have been negligent and his negligence contributed to his injury. *See, e.g., Rivera*, 474 F.2d at 257. Such contributory negligence in a Jones Act case "connotes some careless act or omission on the part of the employee over and above [mere] knowledgeable acceptance" of a risk. *Id.* The defendant must show more than that the seaman simply had knowledge of a hazard; it must show that the seaman "fail[ed] to adopt safer alternative courses of action," and the inquiry at trial should thus "center[ ] on what choices were available to [the Plaintiff] and how he exercised those choices." *Akermanis v. Sea–Land Service, Inc.*, 688 F.2d 898, 904 n. 2 (2d Cir.1982).

In the present case, the district court, citing *Rivera*, expressly discussed the differences between the concepts of assumption of risk and comparative or contributory negligence. Noting that "[n]othing about [its] findings suggest[ed] that [the court thought] it was necessary for the performance of Mr. Ammar's duties that he accept the risk of climbing on board the crane," the court stated that its "findings all relate to the theory of contributory or comparative negligence," which "connotes some careless act or omission on the part of the employee, over and above that knowledgeable acceptance" of risk. (Dec. 5 Tr. at 26.)

As discussed in Part II.B. below, the court's findings focused not simply on Ammar's knowledge of the danger in the approach he took but also on the existence of less dangerous approaches and Ammar's

awareness of those alternatives. Thus, Ammar's contention that the court applied erroneous legal principles finds no support in the record.

## B. *The Finding that Ammar Was Contributorily Negligent*

Ammar argues that the district court erred in finding as a factual matter that he was contributorily negligent, *i.e.,* that he not only was aware that it was dangerous to stand on the crane's pedestal and step on the remote control box but also knew that safer alternatives were available. He argues, *inter alia,* that the court's finding that such safer alternatives existed was based on its understanding of the workings of the crane as reflected in a court-drawn diagram that Ammar contends was flawed. He also contends that the court should have allowed him to place in evidence a different diagram of the crane. These contentions provide no basis for reversal.

■ First, we reject Ammar's contention that the court's use of the diagram it sketched constituted error. The court drew its diagram of the crane during the trial in order to understand how the crane functioned, because the court found Ammar's presentation confusing. The court showed its diagram to Ammar during his testimony and asked whether the diagram correctly depicted, *inter alia,* the position of the crane on the 03 deck in relation to the pertinent 02 deck hatch, the location of the control box on the crane, the direction toward which the boom was pointing, the directions in which the boom would be moved at various times, the resulting location of the control box in relation to those boom movements, and the relation of the control box to the 03 deck and its railing. (*See* Trial Transcript October 24, 2001, at 177–81.) In every instance, Ammar responded that the court's diagram and its understanding of the positions, movements, and relationships were correct.

The court noted that "[t]he parties ha[d] put [the court's diagram] into evidence" (Oct. 30 Tr. at 8); that the court had shown the sketch to other witnesses to be sure the court's understanding was correct (*see id.;* Dec. 5 Tr. at 6); and that "then the defendant and the plaintiff started using it regularly with respect to various witnesses" (Dec. 5 Tr. at 6). As the court noted, "[c]ertainly if there was any error in that sketch, any witness who was asked about it who had a different view could have explained that." (*Id.*) Only after the trial ended and the court announced its finding that Ammar had been contributorily negligent did Ammar suggest that the diagram was flawed. In all the circumstances, Ammar's contention that the court impermissibly used the diagram is specious.

■ Nor is there any basis for overturning the court's finding that Ammar's own conduct constituted contributory negligence that was in part responsible for his injury. Findings of fact made by the district court after a bench trial may not be set aside on appeal unless they are "clearly erroneous." Fed.R.Civ.P. 52(a). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949). Further, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v.*

*Bessemer City*, 470 U.S. at 575, 105 S.Ct. 1504.

Here, the district court heard the testimony of witnesses from both sides as to the movement and operation of the starboard stores crane, and it received in evidence photographs showing that the on-crane controls could be manipulated by a worker standing on the bottom rung of the 03 deck's railing. The court credited the testimony of the witnesses who stated that Ammar thus could have operated the crane without stepping on the flimsy control box at the base of the crane, and it therefore found that "there was an alternative available to [Ammar] other than climbing on board the crane" (Dec. 5 Tr. at 27), *i.e.*, "that he could have manipulated the controls by moving around the railing area of the deck" (*id.*), and that Ammar "did negligently ignore a safer way for him to operate this crane at a time when the body pack was inoperable" (*id.* at 31). These findings were based on credibility determinations that we are not entitled to second-guess and on inferences that were permissible in light of the evidence at trial. The district court properly applied the principles discussed in Part II.A. above, reviewing Ammar's actions for reasonableness in light of the alternatives that the court found were both available to him and known to him, and we see no clear error in its finding that Ammar's decision to mount the pedestal and step on the flimsy control box, rather than adopt the safer alternative of standing on a rung of the ship's railing, constituted contributory negligence.

■■■ · Finally, there is no merit in Ammar's contention that the court should have granted his motion, made after the trial had concluded and the court had announced its liability findings, for permission to present a new diagram and an affidavit from his expert witness as evidence that the crane could not have been operated in accordance with the court's finding that Ammar had been contributorily negligent. A motion to reopen the record for the presentation of new evidence is addressed to the sound discretion of the court. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986). We see no abuse of discretion here. Ammar had ample opportunity to provide evidence during the trial. As discussed above, the court's diagram was used extensively at trial by the court and the parties. Further, after the court had posed questions to the defense expert as to the functioning of the crane, the court had expressly invited Ammar to conduct further cross-examination, or to resume his own testimony, or to recall his own expert witness to the stand. The court was not required to allow Ammar to reopen the evidence after he learned of the court's liability ruling.

## C. *The Limited Award of Medical Expenses*

■■■ Ammar's other contentions include his challenge to the district court's refusal to award him medical expenses other than the sum of $3,900 for future psychiatric care. These contentions are without merit. The court's rejection of Ammar's evidence as to other recoverable medical fees was expressly based on its findings that the testimony of Ammar's medical witnesses at trial was not sufficiently credible and that the charges had been "inflated" for purposes of litigation. (Oct. 30 Tr. at 14 ("To a certain extent their credentials, certainly their methodology, and also their motives since both of them have a real financial interest in this case, [are] such that the Court is not prepared to rely on them .... Mr. Ammar's

condition does not appear to be as represented by these doctors, at least I don't find adequate medical evidence to support" their diagnoses.).) As discussed above, we are not entitled to overturn the trial court's credibility determinations. Hence, there is no basis for reversal.

Ammar's remaining contentions similarly lack merit and do not warrant discussion.

### III. THE UNITED STATES'S CROSS–APPEAL

On the cross-appeal, the United States contends (a) that the district court erred in awarding Ammar maintenance in excess of the $8–per–day rate agreed to in the collective bargaining agreement, and (b) that the court should have discounted to present value the award for future wages and future medical expenses. For the reasons that follow, we agree.

### A. *The Seaman's Right to Maintenance*

Under the general maritime law of the United States, "maintenance" refers to the duty of a vessel owner to provide food and lodging, comparable to that received aboard the vessel, to a seaman who falls ill or becomes injured while in the service of the vessel. *See, e.g., Vella v. Ford Motor Co.,* 421 U.S. 1, 3, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903); G. Gilmore and C. Black, Jr., *The Law of Admiralty* 281 (2d ed. 1975) ("Gilmore & Black"); T. Schoenbaum, *Admiralty and Maritime Law* § 6–28, at 348 (2d ed. 1994) ("Schoenbaum"). The duty to pay maintenance arises regardless of whether the shipowner was negligent and regardless of whether the illness or injury was job-related, *see, e.g., Vella v. Ford Motor Co.,* 421 U.S. at 4, 95 S.Ct. 1381; and the duty to make such payments continues until the seaman has recovered or his condition is declared permanent and incurable, *see, e.g., id.* at 5, 95 S.Ct. 1381; *Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

> The reasons underlying the rule ... are those enumerated in the classic passage by Mr. Justice Story in *Harden v. Gordon,* Fed. Cas. No. 6047 (C.C.) [1823]: the protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service.

*Vaughan v. Atkinson,* 369 U.S. at 531, 82 S.Ct. 997. (internal quotation marks omitted). As a right judicially fashioned to protect "poor, friendless and improvident" seamen,

> [m]aintenance ... differs from rights normally classified as contractual. As Mr. Justice Cardozo said in *Cortes v. Baltimore Insular Line, supra,* [287 U.S. 367,] 371, 53 S.Ct. 173, 77 L.Ed. 368 [1932], the duty to provide maintenance ... "is imposed by the law itself as one annexed to the employment.... Contractual it is in the sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident."

*Vaughan v. Atkinson,* 369 U.S. at 532–33, 82 S.Ct. 997 (footnote omitted). *See also De Zon v. American President Lines,* 318 U.S. 660, 667, 63 S.Ct. 814, 87 L.Ed. 1065 (1943) (a shipowner's provision of maintenance is "a duty that no private agreement is competent to abrogate.")

Historically, the amount of a maintenance award was determined by the court, "taking into account all relevant circumstances, such as the somewhat equivalent costs for housing and food ashore as well as regional differences in prices in the United States." G. Mangone, *United States Admiralty Law* 127 (1997) ("Mangone"). In the late 1940s, the judicially approved rate of maintenance was $8 per day. *See, e.g.,* Gilmore & Black at 307. That $8–per–day rate remained standard until the 1970s. *See, e.g.,* Gary Michael Haugen, *Maintenance and Cure: Contract Right or Legal Obligation?,* 62 Tul. L.Rev. 625, 625 (1988).

From at least 1957 until the late 1980s, collective bargaining agreements ("CBAs") between vessel owners and seamen's unions uniformly set the maintenance rate at $8 per day. *See* Mangone at 127. Thereafter, some CBAs set different amounts such as $10 per day, *see, e.g., Macedo v. F/V Paul & Michelle,* 868 F.2d 519, 522 (1st Cir.1989), or $15 per day, *see, e.g., Frederick v. Kirby Tankships, Inc.,* 205 F.3d 1277, 1292 (11th Cir.2000); *Durfor v. K–Sea Transportation Corp.,* No. 00 Civ. 6782, 2001 WL 856612, at *1 (S.D.N.Y. July 30, 2001), or $30 per day, *see, e.g., Covella v. Buchanan Marine, Inc.,* No. 95 Civ. 6514, 1996 WL 164482, at *1 (S.D.N.Y. Apr.9, 1996). In the wake of such agreements, defendants in suits by seaman claiming maintenance have contended that the maintenance to which the seaman is entitled is the rate specified in the CBA. This contention has divided the federal courts of appeals that have addressed it, with the First, Fifth, Sixth, Ninth, and Eleventh Circuits ruling that a seaman who is a member of a union that has agreed to a specified daily rate of maintenance is, despite having incurred higher actual costs, limited to recovery of that rate, *see Frederick v. Kirby Tankships, Inc.,* 205 F.3d 1277, 1292 (11th Cir.2000);

*Baldassaro v. United States,* 64 F.3d 206, 212–13 (5th Cir.1995); *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585, 588 (6th Cir.1989); *Macedo v. F/V Paul & Michelle,* 868 F.2d 519, 522 (1st Cir.1989); *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943, 949–50 (9th Cir.) ("*Gardiner*"), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986), and the Third Circuit ruling that the collective bargaining agreement rate is not binding, *see Barnes v. Andover Co., L.P.,* 900 F.2d 630, 640 (3d Cir.1990) ("*Barnes*").

In *Gardiner,* the seminal court of appeals decision on this issue, the Ninth Circuit—although rejecting the defense contention that, to the extent a CBA establishes a daily maintenance rate, the traditional right to maintenance has been preempted by the federal labor laws—ruled that "the broad policies which underg[ir]d the labor laws, as well as the nature of the collective bargaining process, require nevertheless that the maintenance rate expressed in the collective bargaining agreement be enforced." *Id.* at 948. The court reasoned that the importance of collective bargaining to industrial peace is such that a CBA, although it could not properly eliminate all right to maintenance, may properly limit its amount:

Important policies support the enforceability of the maintenance rate involved in this case .... Congress viewed collective bargaining as a key instrument in its effort to promote industrial peace.... *Our national labor policy is built on the premise that employees can bargain most effectively for improvements in wages, hours, and working conditions by pooling their economic strength and acting through freely chosen labor organizations. NLRB v. Allis–Chalmers Manufacturing Co.,* 388 U.S. 175, 180, 87 S.Ct.

2001, 2006, 18 L.Ed.2d 1123 (1967). *Consequently, this court will not lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement and will choose the rule that will promote the enforcement of collective bargaining agreements .... Although the right to maintenance is presumed to exist because of its establishment at common law, its rate may be subject to the negotiation process.* "The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 578–79, 80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409 (1960). Thus, it is clearly the policy of our national labor legislation to encourage both labor and management to negotiate contracts that will effectively regulate every aspect of their complex relationship.... *As the Supreme Court has noted, "[t]he mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time." United Steelworkers of America,* 363 U.S. at 580, 80 S.Ct. at 1350–51, 80 S.Ct. 1347.

Here, the parties to the agreement included the traditional right to maintenance as a subject of the negotiating process. The resulting collective bargaining agreement incorporated an explicit rate of maintenance as one of its terms. *We cannot fairly say that this rate, as a consequence of the normal "give and take" process of collective bargaining, is not entitled to the same reliability accorded to other terms and conditions within the same agreement.* The national labor policy of promoting and encouraging collective bargaining

agreements would be unduly compromised were we to conclude otherwise. *Gardiner,* 786 F.2d at 948–49 (other internal quotation marks omitted) (emphases ours).

The court reasoned that, because "[t]he rate of maintenance is but one of many elements contained within the Union contract and over which the parties negotiate," *id.* at 949 (internal quotation marks omitted), the "adequacy of the maintenance rate should not be examined in isolation by the court because the determination of its adequacy in relation to the whole scheme of benefits has already been made by the union and the seamen who voted for the contract," *id.* Observing that "there may be a considerable amount of 'give and take' exercised by the parties in coming to a final agreement on all of the elements," *id.* (internal quotation marks omitted), and noting that the collective bargaining agreement in the case before it had, for example, provided for "overtime, premium and penalty pay for unpleasant tasks, for very generous vacation allowances, and for such amenities as television sets and feature films, washers/dryers, ice cream and fresh baked bread," *id.,* the court concluded that "acceptance of a particular package of benefits should be binding on the union members," *id.*

[W]hen a benefits package includes an express reference to a precise rate of maintenance, the adequacy of this rate, considered in isolation, is not a subject for judicial speculation when the rate is part of a total package of wages and benefits resulting from the process of collective bargaining.

*Id.*

The Ninth Circuit's reasoning in *Gardiner* was soon followed by the Sixth Circuit, *see Al–Zawkari v. American S.S. Co.,* 871 F.2d at 588 ("[T]he maintenance per diem rate, like any other benefit,

which is the ultimate result from give and take collective bargaining between the parties, should be binding on them.... Courts generally have decided that it is more appropriate for the courts to enforce privately negotiated contractual rates of maintenance, rather than engaging in overt legislation of particular dollar figures."), and by the First Circuit in *Macedo v. F/V Paul & Michelle*, 868 F.2d at 522 (Supreme Court's dictum in *Vaughan v. Atkinson*, that "no agreement is competent to abrogate the incident" of maintenance, 369 U.S. at 533, 82 S.Ct. 997, is not dispositive in the "quite different" circumstances of a collective bargaining agreement).

Thereafter, the Third Circuit reached the contrary view in *Barnes*, holding that "a union cannot bargain away the individual seaman's common law right to maintenance by agreeing to a wholly inadequate figure as a daily maintenance rate." 900 F.2d at 640. The *Barnes* court acknowledged that "almost every case concerning the right to maintenance relies on Justice Story's description of the seaman as 'generally poor and friendless.'" *Id.* at 636 (quoting *Harden v. Gordon*, 11 F. Cas. 480, 483 (No. 6,047) (CC Me. 1823)). And it acknowledged that "today those seamen who are unionized are neither friendless nor improvident," *Barnes*, 900 F.2d at 636; that "the Seafarers International Union ... has obtained for its members overtime and premium pay, vacation allowances, disability pensions, and amenities such as televisions, washers and dryers, coffee breaks, and midnight lunches," *id.* at 637; that now, "under union contracts[,] ill or injured seamen are quickly repatriated," *id.;* and that the changed circumstances of seamen's unionization "undercut the rationale supporting the traditional right to maintenance and cure," *id.* However, the *Barnes* court found it "inconsistent both with the traditional doctrine of mainte-

nance and with [the] rejection of preemption of maintenance by the labor laws to hold that the maintenance rate set in the collective bargaining agreement is binding on a seaman who can show higher daily expenses." *Id.* at 640. Having noted that "the Supreme Court has shown no inclination to depart from its long-established solicitude for seamen," *id.* at 637, the Third Circuit concluded that "unless Congress determines that the circumstances giving rise to the need for maintenance have changed and that collective bargaining is now a more appropriate way to deal with the issue of the ill or injured seaman, the common law remedy must remain in full force," *id.* at 640.

Thereafter, despite the rationale of *Barnes*, the Eleventh and Fifth Circuits found the reasoning of *Gardiner* more persuasive and ruled that, in light of unionization, seamen should no longer be considered weak and friendless, and that in the absence of any assertion of unfairness in the collective bargaining agreement as a whole the CBA-established maintenance rate should be honored. *See Frederick v. Kirby Tankships, Inc.*, 205 F.3d at 1291–92; *Baldassaro v. United States*, 64 F.3d at 212–13.

No opinion of this Court has discussed the issue of whether the maintenance rate in a CBA should be upheld when that amount is less than the unionized seaman's actual expenses. In a case involving a seaman who was not a union member, we held that the $8–per–day union rate was not binding. *See Incandela v. American Dredging Co.*, 659 F.2d 11, 14 (2d Cir. 1981). In a case brought by a union member, we affirmed the judgment limiting his maintenance award to the $8–per–day collective bargaining rate, but we did so without opinion. *See Dixon v. Maritime Overseas Corp.*, 490 F.Supp. 1191, 1194 (S.D.N.Y.), *aff'd*, 646 F.2d 560 (2d Cir.

1980) (table), *cert. denied,* 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981).

The district court opinions within this Circuit have been divided. Some have adopted the majority view initiated in *Gardiner.* *See, e.g., Denardo v. Energy Transportation Corp.,* No. 87 Civ. 7202, 1989 WL 58038, at *1 (S.D.N.Y. May 19, 1989) (CBA rate of $8 per day binding); *Dixon v. Maritime Overseas Corp.,* 490 F.Supp. at 1194 (same). But most have adopted the view of the Third Circuit in *Barnes.* *See, e.g., Durfor v. K–Sea Transportation Corp.,* 2001 WL 856612, at *3–*4 (CBA rate of $15 per day not binding); *Bachir v. Transoceanic Cable Ship Co.,* No. 98 Civ. 4625, 1998 WL 831035, at *2 (S.D.N.Y. Nov.24, 1998) (CBA rate of $8 per day not binding); *Brown v. United States,* 882 F.Supp. 1424, 1427 (S.D.N.Y. 1995) (same); *Gillikin v. United States,* 764 F.Supp. 261, 264–65 (E.D.N.Y.1991) (same).

■■■ After reviewing the competing factors, we adopt the majority view as elaborated by *Gardiner.* We are persuaded by the considerations that "[n]ational labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions," *NLRB v. Allis–Chalmers Manufacturing Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); that the federal courts have authority to "fashion a body of federal law for the enforcement of . . . collective bargaining agreements," *Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); and that today, "most seamen are union members with a union-negotiated package of compensation and benefits of which the right to mainte-

nance is a small component," Schoenbaum § 6–32, at 361. The modern reality is that most seamen are no longer "friendless"; rather, they have gained strength through collectivity, and they are a well-organized work force with sophisticated leaders who constantly press for better working conditions, pay, and benefits, as well as increased job security. Thus, the need for judicial intervention to protect seamen has been substantially lessened. Recognizing both the goal of providing protection for injured seamen and the importance of collective bargaining to industrial peace, we conclude that, in light of the reality of modern circumstances, the appropriate accommodation between federal maritime common law and federal common law for the enforcement of collective bargaining agreements is to allow unionized seamen to bargain for rights and privileges they prefer in exchange for limiting the per diem rate of maintenance.

■■■ As noted in Part I.B above, § 13 of the collective bargaining agreement between BSM and Ammar's union, the Seafarers International Union, provides that when a member is entitled to maintenance, the rate is to be $8 per day. That agreement also covers work rules, compensation including wage increases, and work-related perquisites including bonuses, overtime, vacation, and benefits plans. Plainly, many, if not all, aspects of the seamen's working conditions were considered and were the subject of bargaining. Ammar does not assert that that agreement was not a legitimately negotiated agreement, or that his interests were not adequately represented in the negotiation process, or that the agreement as a whole is unfair. Nor have we seen in the record any reason to believe that the collective bargaining process was unfair or that the maintenance provision in the CBA was not subject to negotiation. We conclude that, in these

circumstances, although $8 per day is not sufficient to meet modern daily living expenses and would be an inappropriate rate if viewed in isolation, that per diem is more properly viewed as but a small component of the union-negotiated package of compensation and benefits that should as a package be accorded deference from the courts. We thus conclude that the district court should have limited Ammar's recovery of maintenance to the CBA-established rate of $8 per day, and we remand for recalculation of that award.

### B. *The Failure To Discount Future Pecuniary Awards*

■ Finally, the United States contends that the district court erred in failing to discount to present value Ammar's award for lost future wages and future medical expenses. The United States argues that the court should have applied a 2% discount rate, calculated on a year-by-year "sliding scale" basis using standard economic tables. We agree that adjustment should have been made.

■ It is established that an award of damages to compensate for losses of future income or for anticipated future expenditures must be adjusted to take into account the earning power of money over a period of time. *See, e.g., Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 536–37, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) ("It has been settled since our decision in *Chesapeake & Ohio R. Co. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916), that 'in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.' *Id.,* at 490, 36 S.Ct. 630"); *Ramirez v. New York City Off–Track Betting Corp.,* 112 F.3d 38, 42 (2d Cir.1997); *Metz v. United Technologies Corp.,* 754 F.2d 63, 66 (2d Cir.1985) ("[I]n computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only." (internal quotation marks omitted)).

■ Additional discounting may be needed to account for inflation where the award has been increased to anticipate an inflationary effect on, for example, higher wages, *see, e.g., Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. at 538–39, 103 S.Ct. 2541; but where there has been no such increase, there need be no deeper discounting, and the discount rate should reflect only the time value of the money, *see, e.g., id.* at 536, 103 S.Ct. 2541 ("[E]ven in an inflation-free economy the award of damages to replace the lost stream of income cannot be computed simply by totaling up the sum of the periodic payments. For the damages award is paid in a lump sum at the conclusion of the litigation, and when it—or even a part of it—is invested, it will earn additional money."); *In re Connecticut National Bank,* 928 F.2d 39, 44–45 (2d Cir.1991) ("To account for inflation, a future stream of earnings could be increased, before discounting, to reflect cost-of-living increases likely to occur because of inflation; if such increases are made, then the appropriate discount rate is the estimated future market rate of interest, *i.e.,* a rate that includes a component to reflect inflation. *Alternatively, inflation can be accounted for by using an inflation-free discount rate, in which event no increase should be made to the stream of earnings because of inflation . . . .*" (emphasis added)); *Metz v. United Technolo-*

*gies Corp.*, 754 F.2d at 68 n. 3 (even where there has been no adjustment on account of inflation, the court must "reach a result that properly takes into account the time value of money").

■ In order to calculate the "present value of a lost stream of earnings in an inflation-free economy," the court should calculate

(1) the amount that the employee would have earned during each year that he could have been expected to work after the injury, and (2) the appropriate discount rate, reflecting the safest available investment. The trier of fact should apply the discount rate to each of the estimated installments in the lost stream of income, and then add up the discounted installments to determine the total award.

*Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. at 537–38, 103 S.Ct. 2541. Where the parties have adduced no evidence relating to the discount rate and there has been no upward adjustment of the undiscounted lost wages figure to cover future inflation, this Court has authorized district judges to use a discount rate of 2% per year. *See, e.g., Ramirez v. New York City Off–Track Betting Corp.*, 112 F.3d at 41; *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746 (2d Cir.1988); *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39–40 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). *See also Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. at 548–49, 103 S.Ct. 2541 (noninflationary discount rate within the 1–3% range deemed acceptable). "The arithmetic necessary for discounting can be simplified through the use of a so-called 'present value table' . . . ." *Id.* at 537 n. 21, 103 S.Ct. 2541.

In the present case, the district court made no time-value discount of its awards to Ammar for future lost wages and future medical expenses. The court had noted the appropriateness of discounting for the time value of money in connection with the awards to Ammar for his lost pension and for pain and suffering. (*See* Oct. 30 Tr. at 27–28 ("I have to award . . . the present value of . . . pension benefits" because "a dollar today, awarded today, is worth more in the future than it would be if it was received at that later date."); Dec. 5 Tr. at 57 ("With respect to the pain and suffering, I recognize that . . . . [it] is required . . . that the time value of money be taken into account.").) And at the October hearing, the court had asked the parties to make whatever submissions they wished as to the proper discounting of future damages. In response, the United States contended that the court should apply a 2% discount to all categories of future damages once the court had apportioned its awards between past damages and future damages; the United States attached a sliding-scale "Present Value Table" to facilitate the calculation of the present value of future damages with respect to the appropriate rate of interest and number of years.

At the December 5 hearing, noting that neither side had submitted precise dollar amounts reflecting discounting, the court stated that it would not discount the award for future lost wages because it had not adjusted lost wages upward to account for inflation:

THE COURT: Let me explain how the Court is going to deal with the question of adjustment. In reading the Ramirez case, which I will note did not involve the United States as a defendant, the Court discusses a number of factors that are relevant to calculating damages. Even before it gets to discounting pain and suffering damages by 2%, it does some discussion of discount rates with respect to wage figures. In

that case, there was an adjustment to the wage figure to cover future inflation and then there was a question of discounting. Indeed, the case was remanded on the issue of the discount rate to be applied to the damage awards for loss of income, since it was not clear that that had been applied.

In this case, where I did not adjust for inflation because I had no evidence presented to me as to how collective bargaining agreements in the past had dealt with that subject, but because common sense necessarily dictates that increases, especially in industries that have bargaining, do take place with some regularity based on inflation and costs, I am prepared to not adjust the wages at all. I have not adjusted them upward but I don't think that it would be appropriate to discount them.

(Dec. 5 Tr. at 56–57.) Although the court correctly reasoned that it need not discount for inflation the future lost wages it had calculated without reference to inflation, it erred in not proceeding to discount that award at a noninflationary rate to account for the time value of money. The court similarly did not discount the sum awarded for future medical expenses.

Because the court should have discounted the awards for future lost wages and future medical expenses to account for the time value of money, we remand for recalculation of those two awards.

## CONCLUSION

We have considered all of Ammar's contentions in support of his appeal and in opposition to the United States's cross-appeal and have found them to be without merit. On the cross-appeal, we vacate so much of the judgment as (a) awarded maintenance in excess of $8 per day, and (b) awarded damages for lost future wages and future medical expenses without discounting those awards to present value; in all other respects, we affirm. We note that as the United States has not pursued an argument that the district court should also have discounted to present value so much of its award as was attributable to pain and suffering in the future, that issue is not present on this appeal.

The United States contends that the appropriate revisions would result in a reduction of the judgment from $364,309 to $348,158.20. Although Ammar has disputed only the legal contentions rather than the precise dollar amounts of any required adjustment, we conclude that the proper adjustments should be determined in the first instance by the district court.

Judgment affirmed in part, vacated in part, and remanded for modifications consistent with the foregoing.